## FOLBERTH AUTO SPECIALTY CO. v. MAYO-SKINNER MFG. CO.

(District Court, N. D. Illinois, E. D.   August 11, 1923.)

### No. 2576.

1. Patents ⬥112(3)—Presumption of validity is strengthened by contest in Patent Office.

The presumption of novelty and invention arising from the granting of a patent is entitled to greatly increased weight, where the application was sharply contested, and passed the scrutiny of the appellate tribunals of the Patent Office.

2. Patents ⬥17—That structure can be reproduced from parts of prior devices does not negative invention.

That a skilled mechanic, with the patented structure before him, could reproduce it by selecting parts from other patented structures, does not show anticipation or negative invention.

3. Patents ⬥16—"Invention" determined in view of knowledge available when it was made.

An invention is a problem to be solved with the knowledge that was available to the inventor at the time he made his invention.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Invention.]

4. Patents ⬥120—Broad patent not invalidated by prior grant of specific patent on later application.

Delay in granting a broad patent until after the grant of a specific patent to the same patentee on a later application does not invalidate the broad patent.

5. Patents ⬥222—False marking of patented device not a defense to infringement suit.

That complainant placed a false patent marking on his commercial structure is not a defense to a suit for infringement.

6. Patents ⬥328—1,405,773, reissue 15,502, and 1,438,229, for wind shield cleaners, held valid and infringed.

The Folberth patents, No. 1,405,773, reissue No. 15,502 (original No. 1,424,890) and No. 1,438,229, claim 4, all for apparatus for cleaning wind shields, *held* valid as against the defenses of anticipation, lack of invention, and double patenting; also *held* infringed.

In Equity.   Suit by the Folberth Auto Specialty Company against the Mayo-Skinner Manufacturing Company.   Decree for complainant.

The following is the report of Special Master John W. Hill:

This is a patent case in the usual form, brought on the equity side of the court, charging infringement of three letters patent issued to William M. Folberth, of Cleveland, Ohio, for improvements in wind shield cleaners. The subject-matter is a small, highly developed, and specially constructed vacuum motor, particularly designed to operate a movable part or squeegee to keep the wind shield of an automobile clean and clear of obstructions that would interfere with the vision of the driver.   It is specially formed to be mounted upon the windshield, being of such a size and form as not to interfere with the vision of the driver.

In connection with this was the conception and discovery by the inventor that in such a small, specially constructed motor the motive power could be secured by connection with the intake manifold of an internal combustion engine at a point above the carburetor, without interfering with the normal operation of the engine.   This idea of connection with the intake manifold at a point above the carburetor was contrary to the teachings of the art, as fully disclosed by the opinions of a number of the leading experts in that

line of business in this country, who were called and examined by the plaintiff.

The patents involved are letters patent to William M. Folberth, No. 1,405,-773, granted February 7, 1922, for wind shield cleaning apparatus, sometimes referred to as the A patent; letters patent issued to the same patentee, No. 1,438,229, granted December 12, 1922 (this patent is based upon a divisional application from the patent above mentioned); and reissue letters patent to the same inventor, No. 15,502, dated December 5, 1922. The reissue is based upon original letters patent No. 1,424,890, issued August 8, 1922.

All the patents above mentioned, involved in this case, have been duly assigned to the plaintiff. The basis of the suit is found in the amended bill of complaint, filed May 25, 1923, and the answer to the amended bill, filed June 13, 1923.

### The Only Defense.

The only defense relied upon in this case is that of invalidity of the several claims sued upon, and all other issues are excluded, so far as this suit is concerned, by the statements and admissions of counsel upon the record.

The defendant admits that it has manufactured and sold two forms of wind shield cleaners; one known as the "piston type," which is clearly shown and illustrated in "Plaintiff's Exhibit No. 1, Defendant's Alleged Infringing Device," and more clearly shown in "Plaintiff's Exhibit No. 57, skeletonized Form Defendant's Cylinder and Piston Type Alleged Infringing Device." The other is known as the "vane type," clearly shown in the device marked "Plaintiff's Exhibit Defendant's No. 8a Vane Type Alleged Infringing Device,", and "Plaintiff's Exhibit No. 6, Skeletonized Form Defendant's Vane Type Alleged Infringing Device." Defendant admits that, after the issue of all said letters patents herein and before the beginning of this suit, it manufactured and sold both of these types of wind shield cleaners within this district.

The plaintiff contends that the so-called "piston type" of cleaner infringes all the claims of patent No. 1,405,773 (9 in number), all of the claims of reissue patent No. 15,502 (18 in number) and claim 4 of patent No. 1,438,229— a total of 28 claims. It also contends that the defendant, by its manufacture and sale of the "vane type" of wind shield cleaner, has infringed claims 8 and 9 of patent No. 1,405,773, claim 4 of patent No. 1,438,229, and claim 13 of reissue patent No. 15,502—a total of 4 claims.

As set forth in the record, the defendant admits that all of said claims of patent No. 1,405,773, are descriptive of defendant's "piston type" cleaner, that claim 4 of patent No. 1,438,229 is also descriptive of defendant's "piston type" cleaner, and that each of the claims of the reissued patent "is descriptive of defendant's piston type device." Defendant's counsel also admits on the record that claims 8 and 9 of letters patent No. 1,405,773 are descriptive of defendant's cleaner, which has been called the "vane type," stating: "Our defense, so far as this patent is concerned, is directed solely to the validity of the claims. In other words, if the claims are held valid, the defendant has infringed this patent."

. Defendant's counsel also admits that claim 4 of patent No. 1,438,229 is descriptive of defendant's "vane type" of cleaner; that claim 13 of reissue patent No. 15,502 is descriptive of both of the defendant's cleaners and "is infringed by the defendant, if the claim is valid." Defendant's counsel, after having carefully examined the reissue patent referred to, further stated that "the defendant will admit that each of the claims of this patent is descriptive of defendant's piston type device."

The defendant in defining its defense on the record says: "I shall insist that the two valves called for by the claims of that patent [1,309,724] will find their equivalent in a single valve. I will say at this time that I am going to urge that patent in suit No. 1,405,773 is invalid, because the invention covered by such patent in all substantial parts thereof were covered by claims of the prior patent 1,309,724, which, by the way, is not in suit."

The amended answer sets up an extensive list of prior art patents, together with the usual defenses, but, as heretofore stated, all these defenses

were wiped aside and abandoned, with the single exception of the defense of invalidity of the several claims sued on. As shown in paragraph 15 of the amended answer, the defense of double patenting, mentioned in the quotation above, is also set forth. In paragraph 16 of the amended answer, the defense of inoperativeness of the device disclosed in patent No. 1,405,773 is set forth.

In paragraph 17 of the answer, the defendant charges that patent No. 1,438,229 is invalid and void for the reason that the subject-matter claimed therein was disclosed, but not claimed, in the prior patents, No. 1,309,724 and No. 1,352,504, both granted to the said William M. Folberth. Said paragraph also contains the statement that: "Neither patent No. 1,309,724 nor patent No. 1,352,504, nor patent No. 1,405,773 (of which patent No. 1,438,229 purports to be a division) contained any notice that William M. Folberth was claiming or intending to claim the subject-matter to which the claims of patent No. 1,438,229 are now directed." By reason of this lack of notice, and the whole matter set forth in said paragraph, defendant charges that as a matter of law and fact said William M. Folberth abandoned the subject-matter claimed in said patent No. 1,438,229, and is estopped from asserting the same against this defendant.

Paragraph 18 of the answer charges that said patent No. 1,438,229 is invalid and void, because the subject-matter thereof had been put in use by the plaintiff and had been disclosed in patent No. 1,309,724 more than two years before the application for said patent No. 1,438,229 was filed. Paragraph 19 charges false and fraudulent marking of the wind-shield cleaner marketed by the plaintiff, by reason of marking the same "Patented September 14, 1920"; whereas, the said wind shield cleaner as thus marked was not within the scope of the said letters patent issued on September 14, 1920.

Therefore, as stated, the defendant bases its whole defense upon the invalidity of the several claims sued on, relying in its effort to maintain this defense upon the prior art specifically referred to, and upon the several defenses above set forth. Both parties have been represented by able counsel, who have presented the case in all its aspects in a most commendable manner.

### The Facts.

The main facts in relation to the inventions of the several patents sued on are not disputed and may be as briefly stated as possible, as follows:

At or about the year 1903 transparent wind shields began to be employed on automobiles, first, as an accessory, and about three years later, to wit, 1906, they were adopted as "standard equipment"; that is, the cars as sold to the purchaser included the wind shield in place as a part of the car. From the beginning of the use of the wind shield it was found that under certain conditions vision through the wind shield was so interfered with as to render it dangerous to drive the car. The falling of rain and snow upon the wind shield was the principal cause of this difficulty, and this has been experienced by every one who has ever had anything to do with automobiles.

When this difficulty first occurred, the crudest methods were employed to remove the obstruction from a sufficient space on the wind shield, so that the driver could secure an unobstructed view therethrough. The record shows what some of these methods were. Originally the bare hand was used by many to wipe off the snow or rain; some used a cloth or other similar means for the same purpose. As the rain and snow fell upon the outside of the shield, this would necessitate reaching around the end of the wind shield to wipe away a spot as nearly in front of the driver as possible. Obviously, this could be safely done only by stopping the car, and when the rain and snow were falling abundantly it would no sooner be wiped off than the wind shield would be again covered, and therefore the necessity was constant at such periods.

This practically made it imperative that on such occasions the car should be stopped entirely, thus putting it out of commission for the time being. The desirability and necessity of some practical device to accomplish this purpose was clear to every one, not only to mechanics and manufacturers, but also to the users of cars, and it was apparent to all that the practical solution

of the problem would not only add greatly to safety and convenience in using the car, but also probably bring a rich reward to the producer.

This condition led to various forms of so-called hand wipers; that is, devices that were manually operated by the driver. The defendant refers to some of these in the patents that it has set up, and more of them are mentioned by both defendant's and plaintiff's counsel during the argument. Some of the objectionable features attending their use is mentioned by the witnesses. Hand wipers are also in quite common use, and practically all drivers have had more or less experience with them. Two of the witnesses called by the plaintiff had previously been in the business of manufacturing some type of hand wiper, but ceased when the Folberth devices came on the market, testifying that they realized that their own devices could not prevail against Folberth's cleaners.

Other means of keeping wind shields clean were also tried, as the record shows. Some provided a container above the wind shield, which was charged with glycerine, or glycerine and alcohol, or some similar fluid, which could be released, so as to run down on the wind shield, preventing rain from forming in globules, which most seriously interferes with the vision, and permitting the snow to side downward. Will Folberth, the inventor, tried this. Others simply applied such liquids with a cloth or sponge for the same purpose. These means, however, did not prove satisfactory, as they only partially solved the problem on one hand, and, on the other hand, left the wind shield sticky and gummy, so that dust or other foreign matter, striking the wind shield, would adhere thereto, not only tending to obstruct the vision, but also giving the car a dirty, unsightly, and unsatisfactory appearance.

Other efforts were as follows: A peep hole was formed in the glass wind shield; opening the wind shield was common, thus abandoning its advantages for the time being; tilting the upper half of the wind shield backward, so that it could be cleaned from inside the car, was also resorted to. In addition to the hand-operated wind shields of the prior art, a number of power-operated wind shield or window cleaners were also devised. The same difficulty was, of course, present in trolley cars, locomotives, and the like, and window cleaners for them are also considered in the prior art shown by the defendant.

### The Opinion of Automobile Engineers and Experts upon the Wind Shield Cleaner Problem at the Date of Folberth's Invention.

The plaintiff, in order to show the general understanding of automobile engineers and experts at the time William Folberth made the inventions in suit, from 1916 to 1919, placed upon the witness stand some of the best known experts in this country. These included nine of the best known and most experienced automotive engineers in this country. In assuming the burden of proving invention, the plaintiff has thus laid before this court the testimony of the highest authorities in this field.

If anything in any way desirable in the automobile industry was not apparent or obvious to those keen, expert, and largely experienced automobile engineers, it certainly was not obvious to any one. In addition to this, the plaintiff placed upon the stand a number of prominent and well-known business men, who were drivers of cars for many years. These are all men of high standing in the community where they live, whose experience may be taken as typical of the experience of all automobile drivers, and who testify as to the conditions existing before and immediately after Folberth produced his patented automatic wind shield cleaners here in suit. The plaintiff went to the highest authorities to establish the facts pertaining to these inventions, and, as the defendant did not undertake to rebut the testimony of any of these witnesses or challenge said statements to any extent whatever, their testimony conclusively establishes the facts stated by them, for the purposes of this case, and may be fully relied upon.

All these witnesses testified to the desirability and importance of providing some means for automatically cleaning wind shields of automobiles; of the extreme danger of driving an automobile under certain conditions without something of this sort; and of the fact that, while they all recognized the

importance and necessity, and some of them, with all their experience, sought to produce something of this sort, none of them could conceive of a practical means for accomplishing it. In addition to this, these skilled engineers, all looked upon and recognized as authorities in all that pertains to automobiles, testified to the fact that, when the Folberth wind shield cleaner of the patent was first submitted to them, they had no confidence in it and fully believed that operating the device by connecting it to the intake manifold of an internal combustion engine was impractical, undesirable, and would so seriously interfere with the pratical operation of an engine as to render its use dangerous, and that they so advised the various companies with which they were connected.

D. McCall White, who after long experience with leading manufacturers, and who developed the "Liberty engine" for the government, when asked in relation to the practicability of permitting uncarbureted air to be drawn into the intake manifold, in answer to question 18, testified: "I would have entirely rejected it. In fact, when the Folberth was brought to me as the kind of a wind shield wiper to fit on the Lafayette car, which was considered to be the finest automobile, I entirely rejected it, using the ordinary wiper operated by hand as the standard equipment. It was not on account of the cost that we rejected the Folberth, but on account of the fear of air entering above the throttle."

Maj. Matthew B. Morgan, formerly in the government employ as an expert in this line, in answer to question 14, where he was asked what view was held by those skilled in the automobile industry as to permitting uncarbureted air to be drawn into the intake manifold, testified: "A. Very bad practice; in fact, as I stated before, we covered it by inspection in order to keep any leaks from the manifolds or from the exhaust surfaces to keep air from entering any portion above the carburetor." "Q. 25. How general was this view, that this was bad practice, as far as you know? A. It was an ironclad rule. In other words, you might say fundamental, in the general opinions of the carburetion engineers."

Mr. Hinkley, formerly chief engineer with the Chalmers Company, in answer to a question as to what view was held by those skilled in the automobile industry as to permitting uncarbureted air to be drawn into the intake manifold, testified: "Why, it is absolutely fatal to take uncarbureted air in above the carburetor, as far as operation of the engine is concerned. Q. 19. How general was that view held? A. It was universal." In answer to question 17, where he was asked what he thought of the Folberth device at the time he testified, he said: "I think it is a necessity; the automatic principle is a necessity."

Berger, formerly chief engineer of the Cunningham Company, points out the importance of not interfering with the explosive mixture after it leaves the carburetor and the general opinion of engineers on that point. Mr. Taylor, chief engineer for various companies, testifies in relation to the same matter.

Wherefore the record conclusively shows that, at the time William Folberth undertook the solution of this problem, the absolute necessity of a device of this character was universally recognized, not only by the ordinary automobile operator, but also by the most skilled engineers in the country; that none of them, nor any one else, had arrived at a solution of the problem; and that the most experienced and skillful engineers in this industry were a unit in declaring that it would be fatal to the proper and safe operation of an internal combustion engine to admit uncarbureted air into the intake manifold above the carburetor. In this opinion the record shows that both the inventor, William Folberth, and his elder brother, Fred, joined, and Fred, as the record shows, rather peremptorily directed his younger brother, William, to keep away from the intake manifold and not interfere with it. His opinion was based upon an earlier experience he had had with other devices.

The Folberths are experienced engineers in the automotive industry, of many years' experience, and expert operators, driving in races and endurance tests. The record shows that the inventor, William Folberth, after studying every means for operating the wind shield cleaner which he could conceive

of, finally, as he says "became desperate," and in 1916 made up his mind he was going to test out the possibility of using the suction from the intake manifold for driving the device. He placed a testing device upon the car owned by himself and his brother. The result was sufficient to satisfy him that there was ample power for the purpose, if it could be handled.

This test is sufficiently established by the testimony of the inventor and his brother, Fred, both of whom fixed the date with reasonable certainty in connection with other events, and who each made pencil sketches descriptive of the apparatus of this test, as illustrated in Plaintiff's Exhibits Nos. 67a, 68, and 69. The first two of said sketches were made by William Folberth, the patentee, and the latter by Fred Folberth. The witnesses were separated at the time the sketches were made, and Fred Folberth testified that he had not discussed the matter, and had no warning, and did not know that he was to be called upon to make a sketch.

Having later fully satisfied himself that the intake manifold provided sufficient power for this purpose, the inventor from such time on devoted all his energies and ability to developing a motor of sufficient power for the purpose, and which at the same time would not, when connected to the intake manifold, interfere with the proper operation of the engine.

The various exhibits presented to the court clearly illustrate the various steps in the development of the device; the perfected motor being clearly disclosed in "Plaintiff's Exhibit No. 43, Second Commercial Model," and "Plaintiff's Exhibit No. 44, Manufacturer's Model." The details of the completed device are clearly shown in "Plaintiff's Exhibit No. 55, Skeletonized Form of Plaintiff's Cleaner." This exhibit clearly illustrates the highly developed specialized form of motor produced by the inventor for the purpose, in which it will be noted that the intake ports are but slightly larger than a sewing needle, and in the use of which motor the expert witnesses testify that, while effective to operate the device, it does not interfere with the operation of the engine with which it is connected.

The record shows the careful, painstaking efforts of the inventor in a very large number of exhibits as the result of tests and experiments he made to reach this point. In the early part of September, 1919, the inventor had reached the point where the plaintiff decided to test the device out in actual commercial use.

The history of the device from this point on is enlightening. The receipts from the sales of this device in the month of September, 1919, was $208; for the month of October, $1,400; for the month of November, nearly $3,000; and for the month of December, over $6,000—making a total for those months of a little over $10,000. In the year 1920, the receipts were $91,000; in 1921, $222,000; and in 1922, $394,000.

In the beginning the sales were all made to users of cars only, as manufacturers solicited and who referred the matter to their experts refused to have anything to do with it. The Record shows that the plaintiff, starting with a depleted treasury and but a small capital (the original capitalization was only $10,000) has built up this business to the present time, without the necessity of securing additional capital; the sales from the device itself providing sufficient funds for that purpose.

In 1920 Mr. Skinner, president of the defendant company, noticed the plaintiff's cleaner on the market and secured one, and after studying it was impressed with its value and importance. He immediately began to study various ways in which the same results could be secured. In February, 1921, he solicited and secured a consultation with the inventor and the sales manager of the plaintiff, and sought to buy the rights or secure a license for his company, the defendant. He had prepared a license contract, which provided a royalty of $50,000 for the first 150,000 manufactured by the defendant, and a readjustment of the license fee thereafter. As an evidence of good faith, he also placed with this license contract, which had been signed by the defendant, a certified check for $1,000, to be applied as an advance payment. He showed to the inventor some of his sketches and designs, and gave the inventor to understand that, if the license contract was not accepted, he would go no farther. The inventor was apparently favorably in-

clined, but insisted upon his elder brother, Fred, president of the plaintiff company, passing upon and approving the contract. The contract, with the check, was submitted to Mr. Fred Folberth, and considered by the inventor with him, and was finally rejected; the check being returned and the contracts destroyed.

Mr. Skinner secured a copy of the patent No. 1,309,724, the diaphragm patent, the first Folberth patent issued, and, after considering it with his counsel, he testifies that he thought Folberth had made a broad invention and was entitled to broader claims than the patent referred to disclosed. Folberth told him of other pending patents, during the conference, but Skinner says he took that statement "with a grain of salt," thinking Folberth boasting. Skinner had a copy of this patent and was familiar with it at the time of the consultation in February, 1921, when he sought to purchase the patent or to secure a license under it. Being unable to purchase the patent or to secure a license, he then procured a copy of the file wrapper contents of that patent, 1,309,724, and later secured a copy of one of the references, a patent to E. P. Noyes, No. 979,788, dated December 20, 1910.

The defendant then secured rights under the Noyes patent and arranged for another consultation with the plaintiff. This was held at Cleveland, Ohio, and Mr. Parker, the plaintiff's attorney from Washington, was present. The defendant threatened suit against the plaintiff upon the Noyes patent, claiming that it was a broad patent and covered the field. This was something of a shock to the plaintiffs, and they passed the matter to their counsel for his decision. A member of counsel's family was ill in Washington, and he stated that he desired an opportunity to look into the matter more closely, and, owing to the illness in his family, must return to Washington at once. He asked for a week or 10 days in which to make his report. From the record this appears to have been granted. It is apparent, at least, that the plaintiffs and its counsel so understood it.

This was upon Saturday. The defendant returned to Chicago, and on the following Monday brought suit on the Noyes patent against the Chicago distributors of the plaintiff, notifying the plaintiff thereof and circularizing the trade generally all over the country. Their circulars referred to the suit. The letter of notice that the defendant sent to the plaintiff in relation to this suit was not placed in evidence as an exhibit, but it was copied into the record on page 249 thereof. It appears that this letter was dated December 19, 1921. This suit against the plaintiff's distributors has not yet been disposed of, but is still pending.

The defendant had begun circularizing the trade as early as October 10, 1921, and on the date of the letter notifying the plaintiffs of the suit mentioned, to wit, December 19th, it sent a letter to the trade generally. These two letters, as well as others sent out by the defendant, are in evidence, being marked "Plaintiff's Exhibit No. 51, Defendant's Letters to the Trade." The effect of these letters was marked, to such an extent that Mr. Fred Folberth testifies that it practically paralyzed their business for three months.

After bringing of said suit and the disturbance to their business, the plaintiffs acquired a patent to A. E. Wittig, dated September 13, 1921, No. 1,390,662, and, being advised by counsel that its claims were of sufficient scope to cover the form of device that was being marketed by the defendant, Mr. Fred Folberth came to Chicago, and after consultation with Chicago counsel suit was brought against the defendant on the Wittig patent in this district. The plaintiff, in attempting to overcome the injurious effect of the defendant's letters, on December 23d and on January 28th also circularized the trade, and on January 30, 1922, it notified the trade in a circular letter of the suit against the defendant on the Wittig patent. The plaintiff's circulars are in evidence, and are shown in "Plaintiff's Exhibit No. 52, Plaintiff's Circular Letters to the Trade."

At the time the suit was brought on the Wittig patent, the plaintiff's broad patent No. 1,405,773, had not been issued, as, owing to the broad scope of its claims, opposition was encountered in the Patent Office, which delayed it for nearly three years after it was filed. The Washington counsel did not think it was wise to bring suit on the Wittig patent, and so notified the

plaintiff, and later that suit was dismissed. When the broad patent above referred to, No. 1,405,773, was issued on February 7, 1922, this present suit was immediately brought thereon. The suit on the Wittig patent was dismissed after this present suit was brought.

None of the facts above recited are denied or attacked in any way. The record does not show that any one connected with the defendant conceived of anything of this general character until Mr. Skinner had his attention called to the plaintiff's device, then on the market.

It is unusual to find such a determined and persistent attempt, and under such circumstances, to either force the inventor to yield a part of the benefits of a meritorious invention, or paralyze him and put him out of business entirely. From the recitation of the said undisputed facts, it is apparent that the equities in this case overwhelmingly favor the plaintiff.

### The Law.

Under our laws, when the world has been desirous of accomplishing in the domain of the mechanic arts some important, practical result, and has not known how to accomplish it, the man who discovers or invents a way to do it is entitled to a patent commensurate with his invention and discovery. It does not matter how slight is the change which he makes in the old structures or processes, provided it accomplishes the hitherto unattained results. These are axiomatic truths, and are familiar to all who thoroughly understand the spirit and meaning of our patent laws. The Supreme Court expressed the whole idea when it said in the Barbed Wire Cases, 143 U. S. 275, 283, 12 Sup. Ct. 443, 450, 36 L. Ed. 154: "In the law of patents, it is the last step that wins."

Reiss invented the telephone transmitter in 1863, but on a false theory he adjusted the electrodes to break contact with each vibration of the diaphragm. The Telephone Cases, 126 U. S. 41, 8 Sup. Ct. 778, 31 L. Ed. 863. It was subsequently discovered that they should be adjusted so as not to break contact. The whole difference lay simply in adjusting the device to a very slight extent. On this narrow basis the whole Bell telephone monopoly rested.

In Clough v. Barker, 106 U. S. 166, 175, 176, 1 Sup. Ct. 188, 27 L. Ed. 134, the two devices were substantially identical, as the report shows. The subject-matter was vapor burners, and each surrounded his burner with an adjustable tube, Barker being the first to do this; but Barker adjusted the outside tube to control the flow of vapor through the tip. Clough adjusted it a little further, to control the flow of vapor outside of the tip. The court held that the Clough patent was valid, notwithstanding Barker's close approach to the idea, and in the later case of Morley v. Lancaster, 129 U. S. 263, 275, 9 Sup. Ct. 299, 32 L. Ed. 715, the Supreme Court stated that the Clough adjustment constituted a generic invention. Both Barker's and Clough's devices could, without changing, be adjusted to the same extent so to produce the same result; but Barker did not intend to adjust his tube far enough to let the vapor escape around the tip, while Clough did so intend. The Supreme Court held that Barker did not discover the practical advantage of the further adjustment, and therefore did not anticipate Clough's invention.

The most recent case by the Supreme Court—Eibel Process Co. v. Minnesota & Ontario Paper Co., 43 Sup. Ct. 322, 67 L. Ed. ——, decided February, 1923, is to the same point. Many other cases to the same point could be cited.

Considering the several inventions of the claims here involved in this light, the record clearly shows that Folberth did something that had never been done before, and supplied a long felt want in a thoroughly practical and efficient manner.

### Case A, Patent No. 1,405,773.

[1] Case A, the broad patent, No. 1,405,773, was filed January 25, 1919, and the patent was issued February 7, 1922, nearly three years later. The certified copy of the file wrapper contents, offered as an exhibit, marked "Plaintiff's Exhibit No. 9, File Wrapper Contents, Patent in Suit 1,405,773,"

shows that the application embodying these broad claims was strenuously contested throughout its course. There were two appeals from the decision of the Examiner to the Board of Examiners in Chief, and two appeals from the Board of Examiners in Chief to the Commissioner of Patents. The case was recalled once for the purpose of admitting further references, and the Examiner appears to have exhausted every source in his careful search for references which would serve to limit the claims.

Therefore, this patent was issued after the necessarily careful scrutiny, not only of the Examiner, but also of the Board of Examiners in Chief and the Commissioner of Patents. Under such circumstances, the rule expressed by all the courts that the claims of a patent are prima facie valid, because of their examination and allowance in the Patent Office, is greatly strengthened. As was stated by Chief Justice Taft in Hildreth v. Mastoras, 257 U. S. 27, 42 Sup. Ct. 20, 66 L. Ed. 112: "The presumption of priority and novelty which arises from the granting of a patent must have greatly increased weight when the claims of the inventor are subjected to such close and careful scrutiny under the stimulus of a heated contest."

In Imperial Bottle Cap & Machine Co. v. Crown Cork & Seal Co., 139 Fed. 312, 71 C. C. A. 442 (C. C. A. 4th Circuit), referring to the same matter, the court said: "There is always a presumption of novelty arising from the patent itself, greater or less, according to circumstances. If the patent relates to something of temporary interest, and the object sought is of little importance, and offers but slight chance of profitable use, it may receive but little attention in the Patent Office, and the presumption therefore is slight; but where the problem sought to be solved by the patent is of such importance that the solution of it promises great pecuniary returns, and the testimony shows, as it does in this case, that all the claims of the patent were subject to critical analysis by trained experts in that office, resulting in amendments and disclaimers designed to distinguish it from everything in the prior art, and the subject appears to have been thoroughly threshed out, the presumption in favor of novelty is greater than in those cases where the patent may have passed by inadvertence."

This rule, therefore, applies to the claims of patent No. 1,405,773 with great force. Defendant's position is well illustrated in the attack upon claims 1, 2, 3, and 4 of patent No. 1,405,773. It is here contended that those claims are "invalid in view of the state of the prior art, as exemplified by the following United States letters patent: Wall, No. 1,227,100; Knapper & Marton, No. 490,662; Osmer, No. 899,785; Cady, No. 1,292,430."

These patents are found in a binder with others relied upon by the defendant in "Defendant's Exhibit G, Patents Offered in Evidence by the Defendant." A glance at these patents shows that the Wall patent refers to a wind shield cleaner pivotally supported at its middle and oscillated by an electrically driven motor; Knapper & Marton is a vacuum engine of comparatively large size and peculiar construction, for driving machinery and for ventilating purposes; Osmer is a fluid pressure motor of double piston construction; and Cady is a similar device.

[2] It is not contended that any one of these discloses in and by itself the device defined in any one of the claims mentioned, but defendant contends that from the knowledge gained from the Wall wind shield patent and from the Knapper & Marton engine patent, with the Osmer and Cady double piston patent, a skilled mechanic, if directed to do so, could construct the novel wind shield cleaner defined in any one of the four claims mentioned; that is, taking an element from one, a second element from a second, and a third element from another patent, and being instructed with either the Folberth patent before him or one of the Folberth cleaners before him, a skilled mechanic could reproduce the Folberth device. The courts are unanimous in the conclusion that a meritorious patent cannot be defeated in this way, and this rule has never yet been departed from.

[3] An invention is a problem to be solved with the knowledge that was available to the inventor at the time he made his invention. Of course, a problem solved is a problem no longer; a puzzle solved and explained is a mystery no longer; and after an inventor has pointed the way in the man-

ner which the law requires shall be so clear that one skilled in the art may reproduce the device, it is not uncommon to have it contended that there was no invention at all. What constitutes invention is clearly set forth in General Electric Co. v. Sangamo Electric Co., 174 Fed. 246, 251, 98 C. C. A. 154 (C. C. A. 7th Circuit); Star Brass Works v. General Electric Co., 111 Fed. 398, 49 C. C. A. 409 (C. C. A. 6th Circuit); American Caramel Co. v. White, 234 Fed. 328, 148 C. C. A. 230 (C. C. A. 7th Circuit); and Railroad Supply Co. v. Hart Steel Co. 222 Fed. 261, 138 C. C. A. 23 (C. C. A. 7th Circuit.)

As to the attitude in which the court should approach the prior art as submitted by the defense, our own Circuit Court of Appeals has clearly stated the rule as follows: "So far as human minds are able, judges should exclude from view the disclosure of the patentee, should regard the patentee's problem as of a time antedating the application, and should therefore not too readily accept the ex post facto wisdom of the bystander. Prior art structures are to be examined in view of the purposes and laws of such structures. It is not enough that a prior art device approach very near the idea of the patent in suit; it must so clearly disclose the idea that it would be apparent to a mechanic of ordinary intelligence who was not examining the device for the purpose of discovering in it the idea of the patent; for if he already had that idea, he would not be getting it from the prior art device, but from his own imagination or some other source. Clough v. Barker, 106 U. S. 166, 1 Sup. Ct. 188, 27 L. Ed. 134; Topliff v. Topliff, 145 U. S. 156, 12 Sup. Ct. 825, 36 L. Ed. 658; Potts v. Creager, 155 U. S. 597, 15 Sup. Ct. 194, 39 L. Ed. 275; Diamond Rubber Co. v. Consolidated Tire Co., 220 U. S. 428, 31 Sup. Ct. 444, 55 L. Ed. 527; Ryan v. Goodwin, 3 Sumn. 514, Fed. Cas. No. 12,186; Regent Mfg. Co. v. Penn Electric Co., 121 Fed. 80, 57 C. C. A. 334; Faries Mfg. Co. v. Brown & Co., 121 Fed. 547, 57 C. C. A. 609; Ideal Stopper Co. v. Crown Cork & Seal Co., 131 Fed. 244, 65 C. C. A. 436; Wm. B. Scaife & Sons Co. v. Falls City Woolen Mills, 209 Fed. 210, 126 C. C. A. 304." To the authorities cited above may also be added the very late decision of the Supreme Court in Eibel Process Co. v. Minnesota & Ontario Paper Co., 43 Sup. Ct. 322, 67 L. Ed. ——.

Claims 8 and 9 of patent No. 1,405,773, are claims that specifically provide as an element "an imperforate conduit establishing communication between such suction opening and the intake manifold of said combustion engine." Claim 9 specifically states that the drawing of the air into the intake manifold of the engine shall be done in such manner as not to interfere with the normal operation of the engine. The record shows that the experts testified that the Folberth cleaner fully complies with the letter of this requirement.

Defendant contends that said claims 8 and 9 are invalid, in view of the state of the prior art as exemplified in the patents to Wall, No. 227,100; Knapper & Marton, No. 490,662; Hamilton, No. 1,219,938; Jay, No. 1,390,617; and Jay, No. 1,268,780 (5 patents), together with the group headed "showing the use of manifold suction for various purposes," which group includes the following: Noyes, No. 979,788; Dickson, No. 1,076,198; Nickerson. No. 1,139,707; Jay, No. 1,158,924; Franquist, No. 1,188,061; Berkebile, No. 1,216,542; Wallman, No. 1,250,397; Arbuckle, No. 1,256,284; Ryan, No. 1,258,948; and Varshaw & Gettings, No. 1,267,957 (10 patents); that is, by combining these two groups, including 15 patents, and of course with the knowledge imparted by the Folberth patent, a skilled mechanic could reproduce the patentee's wind shield cleaner. Of course, it goes without saying that, if it takes this mosaic of patents to anticipate the device of the patent sued on, it conclusively shows that the construction was not obvious, and emphasizes the difficulty any one would encounter in trying to solve the problem at the date that William Folberth did.

Referring to claims 5, 6, and 7 of this same patent No. 1,405,773, defendant contends that these claims differ from claims 8 and 9 only in that they differ in slight features, which are not patentable in the light of the Osmer patent and the Cady patent heretofore mentioned. Referring to such defense, Mr. Justice Grier, one of the ablest patent jurists this country has

ever had, in Livingston v. Jones, 1 Fish. Pat. Cas. 526, Fed. Cas. No. 8,413, and Adams v. Jones, 1 Fish. Pat. Cas. 531, Fed. Cas. No. 57, said that the patentees of the earlier patents "came so near the patented device or machine that they might have discovered it, if they had only thought of it." But the court held that such a defense will not invalidate a patent.

In Sickles v. Gloucester Manufacturing Co., 1 Fish. Pat. Cas. 234, Fed. Cas. No. 12,841, Mr. Justice Grier again said: "But it is not an unusual case, even among learned engineers, to see a thing after it is done, which never occurred to their minds before. I am disposed to distrust that wisdom which succeeds the event."

In Consolidated Brake Shoe Co. v. Detroit Steel & Spring Co. (C. C.) reported in 59 Fed. 902, 908, Judge Swan upon this point said: "Without essaying to define the line between the skill of the mechanic and the ingenuity of the inventor, it may be safely affirmed that one who perfects a device of confessed utility, which satisfactorily supplies a long-existing and imperative need of any branch of industry, and which excels in operation and results other existing appliances, superseding them at home and abroad, and by its structure overcoming difficulties and objections which have for years baffled the ingenuity of his fellow craftsmen the world over, including Steel himself, for whose conception so much breadth is claimed, has proved beyond cavil that average mechanical skill was not equal to what he has accomplished. His success is his individual achievement, the product of his inventive faculty, not merely that of his training or vocation."

These claims were all allowed after a most strenuous contest in the Patent Office, as stated. Under the authorities these are valid. Topliff v. Topliff, 145 U. S. 156, 12 Sup. Ct. 825, 36 L. Ed. 658; Seabury & Johnson v. Am Ende, 152 U. S. 561, 14 Sup. Ct. 683, 38 L. Ed. 553; Gray Telephone Pay Station v. Baird Mfg. Co., 174 Fed. 417, 98 C. C. A. 353 (C. C. A. 7th); Canda v. Michigan Iron Co., 124 Fed. 486, 61 C. C. A. 194.

Defendant, however, attacks the validity of claims 8 and 9 of the Folberth patent, No. 1,405,773, from another angle, to wit: That those claims are invalid and void, because the alleged invention covered thereby was patented in claims 1, 2, and 5 of Folberth patent, No. 1,309,724. The defendant relies upon Miller v. Eagle, 151 U. S. 186, 14 Sup. Ct. 310, 38 L. Ed. 121, and Kinloch v. Western, 113 Fed. 652, 51 C. C. A. 362, in support of this contention. The authorities relied upon do not apply in this case.

Miller v. Eagle Mfg. Co., cited by the defendant, has probably been cited by the courts as often as any single decision of the Supreme Court relating to patent matters. The facts in that case were peculiar, as pointed out in the decision. The drawings in both patents were identical, the second patent being a division from the first (151 U. S. 189–193[1]). The patented structure of the first patent, as shown on page 196 of the report, covered both the lifting and depressing actions or operation, while the second patent covered only the lifting effect of the same device; the operations being precisely the same in both structures. The drawings of the two patents were identical, and the specification in each was substantially the same. Therefore the decision is based upon the fact that a device that inherently possesses two functions, both of which are claimed in an earlier patent, cannot be covered in a so-called divisional application on the same drawings, the same specification, to the same inventor, and covering only one of these functions, when as a matter of fact a device constructed in that manner would inevitably possess both the functions pointed out in the earlier patent.

Such are not the facts in this case. The Folberth patent, No. 1,309,724, was filed nearly three months after the application for patent No. 1,405,773 was filed. The device of patent No. 1,309,724 is essentially different in its construction from the device illustrated in the earlier patent, and the claims relied upon specifically include the differences in construction illustrated in the so-called diaphragm patent, No. 1,309,724. Century Electric Co. v. Westinghouse Electric & Mfg. Co., 191 Fed. 350, 112 C. C. A. 8 (C. C. A. 8th Circuit); Gould Storage Battery Co. v. Electric Storage Battery Co., 192 Fed. 28, 112 C. C. A. 416 (C. C. A. 2d Circuit); Dalton Adding Machine Co. v. Rockford Milling Machine Co. (D. C.) 253 Fed. 187.

[1] 14 Sup. Ct. 310, 38 L. Ed. 121.

[4] That the delay in granting the Folberth patent, No. 1,405,773, until after the grant of the specific diaphragm patent, No. 1,309,724, did not affect the scope or validity of the broad patent, is well settled. United States v. American Bell Telephone Co., 167 U. S. 224, 17 Sup. Ct. 809, 42 L. Ed. 144; Badische Anilin & Soda Fabrik v. Klipstein & Co. (C. C.) 125 Fed. 543; Electric Storage Battery Co. v. Buffalo Electric Carriage Co. (C. C.) 117 Fed. 314; Westinghouse Electric & Mfg. Co. v. Electric Appliance Co. (C. C.) 142 Fed. 545; Thomson-Houston Electric Co. v. Winchester Ave. Railway Co. (C. C.) 71 Fed. 192. The authorities in support of this rule could be continued to an unreasonable length.

This defense is insufficient to overcome the prima facie validity of claims 8 and 9 of the Folberth patent, No. 1,405,773. Therefore I am clearly of the opinion that the several claims of the Folberth patent, No. 1,405,773, are valid, and, if valid, are admittedly infringed.

### Patent No. 1,438,229.

Defendant contends that claim 4 of the Folberth patent, No. 1,438,229, is invalid, because the application therefor was not filed until more than two years after the publication of the Folberth patent, No. 1,309,724, the diaphragm patent; and, further, that said claim 4 is invalid because the alleged invention covered thereby was disclosed in said earlier patent, No. 1,309,724, said earlier patent containing no notice that Folberth was reserving the right to claim the alleged invention set forth in said claim 4. On the first contention defendant relies upon the late case of Webster v. Splitdorf (C. C. A.) 283 Fed. 90, and on the latter contention it relies upon Houser v. Starr, 203 Fed. 264, 121 C. C. A. 462.

The Folberth patent, No. 1,438,229, which contains claim 4 mentioned, was a divisional application from the original Case A patent, which was filed on January 25, 1919, and which resulted in the issue of the broad patent, No. 1,405,773. This division was made on the order of the Examiner, as the certified copy of the file wrapper contents of said broad patent discloses. This is shown in "Plaintiff's Exhibit No. 9, File Wrapper Contents, in Suit No. 1,405,773."

The decision of Splitdorf Electric Co. v. Webster was based upon peculiar and very unusual equities, and not upon the two-year rule relied upon by the defendant. This is conclusively shown in 283 Fed. page 94, where the court said: "Turning to the facts in the present case, and for the moment ignoring any two year rule, we find Kane's position in support of claims 7 and 8 untenable." The court then points out that Kane knowingly and intentionally failed to present those claims for eight years after he filed his original application and more than nine years after the device was in common use. The decision is further based upon an estoppel by reason of Kane's laches. The ruling in this case obviously should not be carried beyond the facts there stated. Furthermore, an appeal is now pending in the United States Supreme Court upon this case under a writ of certiorari allowed.

In this present case the question of Folberth's diligence is not raised or questioned to the slightest extent, except only in the bald statement above set forth. Blandy et al. v. Griffith et al., Fed. Cas. No. 1,529. That a division application takes date as of the filing of the original application is clearly established. Smith v. Goodyear Dental Vulcanite Co., 93 U. S. 486, 499, 23 L. Ed. 952; Godfrey v. Eames, 1 Wall. 317, 17 L. Ed. 684; Graham v. McCormick (C. C.) 11 Fed. 859. Ligowski Clay-Pigeon Co. v. American Clay-Bird Co. (C. C.) 34 Fed. 328; Stirling Co. v. St. Louis Brewing Association (C. C.) 79 Fed. 80; Corrington et al. v. Westinghouse Air Brake Co., 178 Fed. 711, 103 C. C. A. 479 (C. C. A. 2d Circuit); Corrington et al. v. Westinghouse Air Brake Co. (C. C.) 173 Fed. 76 (Judge Ray); Clark Blade & Razor Co. v. Gillette Safety Razor Co., 194 Fed. 422, 114 C. C. A. 383 (C. C. A. 3d Circuit).

Furthermore, the drawings shown in the Folberth divisional case, No. 1,438,229, and the certified copy of the file wrapper contents, show that these drawings were included in the original case, illustrating a modification in which a single piston operated in one way, being retracted by a spring, and in which the wiper arm oscillated, rather than moved in a horizontal plane.

The case was properly divisionable from the broad patent, No. 1,405,773, as it shows a limited modification of the device claimed in the broad patent.

Therefore, under the authorities cited, the two years' prior use that would invalidate the divisional application must be computed from the date of filing of the application of Case A, No. 1,405,773, to wit, January 25, 1919. This defense, therefore, as to claim 4 of the Folberth patent, No. 1,438,229, is not sustained.

Defendant, however, makes a further attack on said claim 4 of patent No. 1,438,229, and in an attempt to show its invalidity cites two groups of patents of the prior art, to wit, Wall, No. 1,227,100 and Knapper & Marton, No. 490,662, in one group, and McKee, No. 932,051, Adams, No. 1,054,481, Jones, No. 930,185, and Lux, No. 1,203,202 (six patents in all).

The Wall patent, as we have mentioned in considering claims of patent No. 1,405,773, shows a horizontally arranged wiper pivotally supported at its center, and operated by an independent electric motor. The Knapper & Marton patent discloses a peculiar construction for driving machinery and for ventilating purposes, etc. It is obvious that with these two patents before him, and uninstructed as to the Folberth device, a skilled mechanic would gain no knowledge of the invention of patent No. 1,438,229.

The patent to McKee shows a powerful window-wiping device, driven by air or steam pressure, and adapted for use on a railroad car window. Adams discloses the same kind of device. They are both of peculiar construction, particularly adapted for the purpose described, and in no way resembling the Folberth device, except only in that they are used to wipe or clean windows. Jones, referred to, is a hand wiper of peculiar construction, as is the device of Lux.

Taken singly or all together, the disclosure of these several patents is not sufficient to overcome the validity of claim 4 of the Folberth patent No. 1,438,229.

Reissue Patent No. 15,502.

This patent is a reissue of original patent No. 1,424,890, issued August 8, 1922, and the reissue application was filed promptly on September 18, 1922, less than six weeks after the issue of the original. There is no attack upon this patent relating to its issue, nor does it appear subject to successful attack in this case. Hobbs et al. v. Beach, 180 U. S. 383, 21 Sup. Ct. 409, 45 L. Ed. 586; Thomson-Houston Electric Co. v. Black River Traction Co., 135 Fed. 759, 68 C. C. A. 461; Fay v. Mason (C. C.) 120 Fed. 506; Peter T. Coffield & Son v. Spears & Riddle et al. (C. C.) 169 Fed. 641.

The attack on the reissue patent is based on two groups of patents of the prior art. Claims 1, 2, 3, 4, 6, and 13 of reissue patent, it is contended, are invalid in view of the prior art, as exemplified in the patent to Knapper & Marton, No. 490,662, Hardy, No. 958,492, and Stewart, No. 475,682. Claims 5, 7, 8, 9, 10, 11, 12, 14, 15, 17, and 18 of the reissue patent are attacked as invalid in view of the state of the art, as exemplified in the following six letters patent; Knapper & Marton, Hardy, and Stewart, above mentioned, together with Hamilton, No. 1,219,938, Jay, No. 1,390,617, and Jay, No. 1,268,780.

A glance at the claims of the reissue patent conclusively shows that no one of the claims read upon any single one of the two groups of patents mentioned. It also conclusively shows that not a single device shown in any one of the patents of said groups by and of itself disclosed the device of any one of the claims of the reissue patent. It further conclusively shows that, taking each of the two groups by themselves, all that is disclosed in those letters patent could not be combined to respond to any one of the claims of the reissue patent without important modification and reorganization.

Defendant's contention is apparently that, in the light of the reissue patent and with that as a guide, a skilled mechanic could now produce a device corresponding to the scope of the claims, by taking one part from one patent, another from another, and a third from another, and reshaping and reorganizing them, to bring them together to co-operate in a manner similar to the plaintiff's device. Under the law this may not be done, and the courts

have on almost innumerable occasions stated that a claim for a valuable invention could not be defeated in this manner.

In Topliff v. Topliff, 145 U. S. 156, 12 Sup. Ct. 825, 36 L. Ed. 658, the Supreme Court said: "It is not sufficient to constitute an anticipation that the device relied upon might, by modification, be made to accomplish the function performed by the patent in question, if it were not designed by its maker, nor adapted, nor actually used, for the performance of such functions." In Seabury & Johnson v. Am Ende, 152 U. S. 561, 14 Sup. Ct. 683, 38 L. Ed. 553, the Supreme Court said: "The fact that others have done something quite similar, and have used separately or in different combinations, the ingredients of his [patentee's] claim, should not affect his patent." There is a long line of decisions based upon the two cases above mentioned, but the above are sufficient to show that the defendant's contention in relation to the reissue patent cannot prevail.

The testimony of plaintiff's expert Smythe is enlightening on all these devices, but it is unnecessary to cite it here. It is sufficient for the purpose to say that the record does not affirmatively show that the device illustrated in the Knapper & Marton patent was ever put to practical use, although it may be admitted that suction or vacuum engines have been used. The same may be said of the Hardy wiper motor, as well as the Stewart air pump governor, controlled by an electric snap switch. The record shows, and it is stipulated on pages 481, 482, that the device of the Hamilton patent was never manufactured for sale, and that he never contemplated using the device for the same purpose that the special motor of the reissue patent was provided for.

It is apparent from careful study of the Folberth reissue patent that it discloses great ingenuity in the inventor in providing this specially and highly organized and constructed motor, so peculiarly adapted for the use for which he intended it. The device shown in the Hamilton patent, like those of the Jay patents, 1,268,780, and 1,390,617, discloses single acting devices in which, at longer or shorter intervals, a slight jet of air is delivered to the intake manifold.

So far as the record goes, Folberth was the first to provide any device in which a continuous stream of uncarbureted air is admitted to the intake manifold above the carburetor. It is true that in his device the stream is exceedingly small, as stated elsewhere, not much larger than a cambric needle. But this indicates the ingenuity and skill of the inventor in providing a specially constructed device effectively using this extremely small current of air for the purpose intended, and by means of which small current of air, continuously delivered into the intake manifold, securing a motive power, without in any way interfering with the normal operation of the engine. The experts, after careful tests, have sworn that the operation of the device does not interfere with the normal operation of the engine.

The claims of the reissue patent are valid, and, if valid, admittedly are infringed.

Two other defenses were set up in the defendant's amended answer, to wit, inoperativeness of the device illustrated and claimed in patent No. 1,-405,773, and false and fraudulent marking of the device when first put upon the market.

### Inoperativeness.

In regard to the former defense, it is established that "Plaintiff's Exhibit No. 19, Reproduction of Patented Construction," exemplifies the Folberth patent, No. 1,405,773. Plaintiff asked, in view of the allegations of inoperativeness, leave to make a practical demonstration of the Exhibit No. 19 upon an automobile within the loop district of this city. This was consented to, and the device was tested out in that manner; Mr. Fred Folberth driving the car through the loop, and defendant's counsel handling the valve in an attempt to stop the practical operation of the device. The device operated continuously and without interruption; the master being present and witnessing the test. This defense from that point on was practically dropped. The testimony in relation to this is found commencing on page 470 of the record.

### False Marking.

[5] The charge of false and fraudulent patent marking, of course, is not available in an action of this kind, and is immaterial to the issue, save only as going to the equities of the case. This charge is based upon the fact that the plaintiff, when it first placed its device upon the market, marked thereon "Patented September 14, 1920." This mark was later taken off on the direction of plaintiff's counsel, and the date of its later broad patent, Case A, substituted therefor.

The essential difference between the device of said patent No. 1,352,504, and the device shown in the patent No. 1,405,773, is that in the former the specification describes a device in which the piston is fixed and the cylinder moved longitudinally back and forth on the wind shield, by its operation oscillating the wiper, while in the patent No. 1,405,773 the cylinder is fixed, and the piston moves longitudinally. The said patent No. 1,352,504 has claims that in their scope, and from a simple inspection of them, might be construed broadly enough to cover either type. This is notably true of claim 7.

There is a penalty attached for false marking, but in order to enforce this, an action on the law side of the court and a finding by a jury is required. The courts have decided in this class of cases that intent to deceive the public, and consequently with knowledge of the falsity of the claim must be shown; the question of intent being one to be decided by the jury. See Fed. Statutes Annotated (2d Ed.) vol. 7, § 4901 (Comp. St. § 9447).

The record seems to show that, not only did Mr. Fred Folberth believe that the claims of said patent covered both forms of the device, even at the time he was testifying, but also that he was so advised by his counsel.

### Conclusion.

[6] Considering the whole case, and after giving it most careful analysis, I am clearly of the opinion that the claims sued on, to wit, claims 1 to 9, inclusive, of letters patent No. 1,405,773, granted February 7, 1922; all the claims of reissue patent No. 15,502, dated December 5, 1922, to wit, claims 1 to 18, inclusive; and claim 4 of patent No. 1,438,229, granted December 12, 1922—are valid, and, being valid, are admittedly infringed by the so-called piston type admittedly manufactured and sold by the defendant. Also, claims 8 and 9 of patent No. 1,405,773, claim 4 of patent No. 1,439,229, and claim 12 of reissue patent No. 15,502, being valid, they are admittedly infringed by the so-called vane type of cleaner, admittedly manufactured and sold by the defendant before the beginning of this suit.

Plaintiff is entitled to the usual decree granting the relief prayed, with an injunction and an accounting.

C. L. Parker, of Washington, D. C., and Sprinkle & Smith, of Chicago, Ill., for plaintiff.

Williams, Bradbury, McCaleb & Pierce, of Chicago, Ill., for defendant.

WILKERSON, District Judge. The report of the special master is approved and adopted by the court as its opinion.

292 F.—57