## GIBSON et al. v. SMOOT ENGINEERING CORPORATION.

District Court, D. Delaware. August 28, 1928.

No. 601.

John E. Hubbell and W. Brown Morton (of Pennie, Davis, Marvin &. Edmonds), both of New York City, and William G. Mahaffy, of Wilmington, Del., for plaintiffs.

Richard Eyre and Ralph L. Scott (of Eyre, Scott & Keel), both of New York City, and Charles F. Curley, of Wilmington, Del., for defendant.

MORRIS, District Judge. Six patents and 47 claims are here sued upon. Of these, the plaintiffs, George H. Gibson, patentee, and Leeds & Northrup Company, his licensee, charge the defendant, Smoot Engineering Company, with the infringement of five patents and 41 claims, while by counterclaim the defendant charges the plaintiffs with the infringement of 6 claims of the remaining patent, which was granted to Herbert T. Herr. The art to which all these patents relate is automatic furnace regulation or combustion control, particularly in steam-generating furnaces. The defenses are invalidity and noninfringement.

In steam-generating plants the chief object is to maintain the desired steam pressure even under varying load conditions. A secondary, but nevertheless important, aim is to accomplish the primary object efficiently, with the greatest possible economy in fuel and labor. The sine qua non of a maintained steam pressure is a heat input equal to and balancing the heat output. Ordinarily heat output is due mainly to steam output. Heat input is had through combustion, the chemical union of quantities of fuel and air. The rate of combustion, or heat input, varies with, is fixed and controlled by, the volume of draft. The efficiency of the combustion depends upon the ratio of fuel volume to air or draft volume. The presence or absence of the proper ratio is ascertainable by the $CO_2$ content of the effluent gases. That content is revealed by constantly visible registering and recording devices. If several boilers discharge steam into a common main or header, it is essential to efficiency that each boiler do its share of the work, supply its share of the total steam output. These facts and the advantages of a controlled furnace pressure, of a pressure having a certain relation to atmospheric pressure, were widely known long before the date of any inventive concept here involved.

The problems of the art have been to find the means or methods that can be employed, so to make use of this knowledge as best to bring about, automatically, a balanced heat input and output, obtain the greatest value from the fuel, cause each boiler to contribute its share of steam and control the furnace pressure.

Of Gibson's contributions to the solution of these problems, the patents and claims in issue are: First patent, No. 1,-166,758, applied for June 1, 1914, dated January 4, 1916; claims 1 and 2. Second patent, No. 1,167,343, applied for Oct. 3,

1914, dated January 4, 1916; claims 1, 4, 5, 6, 7, 10, 11, 12, 13, 14, 15, 16. Third patent, No. 1,522,877, applied for November 9, 1915, dated January 13, 1925; claims 9, 10, 11, 12, 13, 14, 16, 17, 18, 19. Fourth patent, No. 1,537,044, applied for September 22, 1916, dated May 5, 1925; claims 19, 22, 23, 27, 30, 38, 52, 53, 58, 59. Fifth patent, No. 1,582,648, applied for May 25, 1918, dated April 27, 1926; claims 10, 11, 12, 13, 14, 15, 16.

The first patent is directed to means for balancing heat input and output; the second, to means for proportioning fuel and air, feeding them into the furnace at a rate depending upon service conditions, and for insuring proper load distribution among the several boilers in a plant; the fourth relates in part to different or improved means to accomplish the same results; while the third, fifth, and the remaining part of the fourth patents are concerned with means for regulating furnace pressure. The means employed by Gibson to accomplish the basic object—the balancing of heat input and output—are specified in the first claim, which may be considered typical of this group, of the first patent, thus:

"The combination with a steam-generating boiler, of means responsive to the amount of steam being withdrawn from the boiler, means responsive to the volume of draft through the furnace, and means controlled jointly by the two first mentioned means for regulating said volume of draft."

The means for regulating the volume of draft is a motor adjustable damper in the air inlet conduit. The action of the motor in direction and degree is controlled, through electric currents, by the movements of a balanced lever. The lever is subjected to opposing forces, one on each side of the fulcrum. One force, in the first patent an electrical current, in the second compressed air, is proportioned in strength by the first-mentioned means of the claim to the rate of *flow* of the steam output. The other or opposing force is made proportional in strength, by the next-mentioned means of the claim, to the volume of flow of gaseous products of combustion through the furnace. If the force transmitted to the balanced lever by the means responsive to steam flow exceeds the opposing force to which the lever is subjected, the lever, by being thus thrown out of balance, causes the motor to adjust the damper to increase the volume of inflowing air, and hence boiler heat input, and thus to bring about and restore the equilibrium between the forces acting upon the lever. In like manner an excess of inflowing air results in a partial or total closing of the damper.

Gibson was not the first to conceive or describe means or methods for automatic furnace regulation or combustion control. Automatic regulators for stokers, for blowers, for dampers to control draft volume, as well as dampers to control furnace pressure, had been employed before he came into the art. Almost, if not, exclusively, however, the automatic controller of the prior art was actuated by steam pressure, not steam flow, changes. The volume of intake air was gauged and controlled by the intake pressure. Volumes and ratios were ascertained indirectly from pressures rather than by direct measurement. In his first two patents Gibson departed from the old practice, and substituted therefor regulation by flow; that is, by direct measurement of volumes.

The plaintiffs state: "Gibson's inventions in mechanisms and methods for proportioning various combustion factors in boiler furnaces to steam load conditions all involve the idea of [directly measured] volume control of the draft and the maintenance of a predetermined relation between the volume of draft and the volume of steam output, or the maintenance of a definite relation between the volume of draft and the fuel feed, which definite relation is dependent upon boiler steam load conditions."

Again they assert, as their main proposition, that Gibson was the first to provide "a system in which a balance is maintained between a force which is a significant measure of the rate of combustion, as the volume of draft is in a grate-fired boiler furnace, and a control force which varies with the load." They consider the first and second patents as pioneer patents in the modern art of combustion control, and the fourth as disclosing and claiming highly useful improvements upon the first and second.

There has been and is no commercial embodiment of the specific structures of these patents. There has been no commercial use of their principle or substance, unless it is to be found in the installations of the defendant, or in the Livingston plant of the corporate plaintiff. These installations are practical, efficient, and productive of great economy in fuel and labor. The plaintiffs seek to explain the failure of Gibson's patents to make any impress upon the

art, at least until defendant's installations, by the fact that he had no organization of his own, and was obliged first to interest another in the patents and proceed through a licensee, and by the inference that he was ahead of his time.

The defendant, on the other hand, denies that Gibson, who lacked practical experience in the art, and who, though present in court, was not called by the plaintiffs to explain his patents or their relation to the prior art, advanced or disclosed any useful or practical ideas. It concedes that Gibson, like all others, sought to bring about a balanced heat input and output; but, it points out, Gibson employed in his combination a flow-actuated, flow-responsive regulator or controller, that is totally insensible and unresponsive to any unbalance between heat input and heat output. Again, the defendant asserts that draft volume can, in practice, be no more accurately measured by Gibson's direct metering devices than it is by the indirect method of measuring pressure, and that, in any event, the pressure differential employed by Gibson to measure volume of draft is a force insufficient for control purposes.

Furthermore, defendant denies that it employs Gibson's combination, for it asserts that its control system lacks, particularly, a flow-actuated, flow-responsive controller, or any equivalent therefor. The controller employed by the defendant is a pressure-actuated mechanism. This is conceded by the plaintiffs. They assert, however, that it is nevertheless flow-responsive, and consequently is at least an equivalent of the flow-actuated element of Gibson's combination. Much expert testimony was adduced by the plaintiffs to sustain this contention. I think, however, it cannot be sustained. A flow-responsive device, as described in plaintiffs' patents, is one actuated directly by the velocity head or kinetic energy of the flow. Defendant's master controller is not so actuated. It responds to pressure changes only.

To say that flow changes pressure, and that consequently defendant's pressure-actuated master controller is flow-responsive, is, it seems to me, to ignore the idea of means. Defendant's device not only functions in a different way, but it produces different results. It maintains the desired pressure, regardless of the cause or manner of heat output. Plaintiffs' device operates only when there is heat output through steam flow. It does not respond, for example, to heat output by radiation.

Again, to produce the desired results, plaintiffs' apparatus must be put into operation when the desired pressure exists. By means of defendant's structure the pressure may be brought to, as well as maintained at, a desired point. Plaintiffs' device subjects the system to the cumulative errors resulting from want of perfect balance between the flow of steam and the flow of air. Defendant's does not. In plaintiffs' patents a flow-actuated control is in several instances contrasted with a pressure-actuated control, even where the latter is connected with the steam header, instead of the boiler.

Assuming, without deciding, that claims 1 and 2 of the first patent, the disclaimer filed thereto, and claims 4, 5, 6, 7, and 10 of the second patent, are valid, I find no infringement by defendant's combinations, for they contain, in my opinion, no flow-actuated or flow-responsive controller or element.

The second patent, however, relates also to means for maintaining a predetermined ratio between the amount of fuel and the amount of air fed to each furnace. Claims 11, 14, and 15, as well as some of the others just considered, calling for a flow-responsive element, have to do with this feature. Of these, claim 14 may, I think, be considered representative. It is:

"In a furnace, the combination of fuel-feeding mechanism, air-supplying means, and means for automatically proportioning the supply of air to the rate at which fuel is fed, comprising means for generating a force which is a function of the rate at which fuel is fed, means for generating a force which is a function of the rate at which air is supplied, and balancing means acted upon by said forces."

In the Smoot system the steam pressure is balanced against the master air pressure, and the master controller regulates to maintain that balance. The master air pressure is also balanced against fuel feed, and, likewise, independently against air volume, with regulators to maintain each of these balances. The master controller thus maintains a balance between heat output or steam pressure, on the one hand, and the input of air and fuel, on the other. But, in addition to that, by having the master control force balanced against a force that is a function of the fuel feed, and likewise balanced against a force that is a function of the volume of draft, the master controller performs the further service of maintaining a constant ratio between the intake of fuel and that of air.

It is thus clear that the forces acting upon the balancing means, regulating the supply of air and the supply of fuel, are not those called for by the claim. In fact, instead of Gibson's one balance, Smoot has two. Identity of structure is lacking. The only question is that of equivalency. There seems to be no doubt that there is identity of function, but there is, I think, a want of substantial identity in the way or manner of performing that function. Smoot's apparatus is the practical and superior one. As Gibson's patent, old as it is, is a paper patent, as the concept of the maintenance of a desired ratio between fuel and draft was not novel with Gibson, and as the revolution in the art has been brought about through Smoot, and particularly because of his regulator, I think any doubt with respect to equivalency must be resolved against the patent. Consequently, assuming claims 11, 14, and 15 to be valid, I find them not infringed.

Of the second patent, the remaining claims in issue are 1, 12, 13, and 16. They are directed to the volume measuring draft regulator. Of this group, No. 1 may stand as the representative. It reads thus:

"In a furnace a draft-regulating device, and in combination therewith means responsive to the volume of draft controlling said device, and tending on a departure in the volume of draft from a predetermined standard to effect a progressive compensating adjustment of said device, continuing until the draft returns to said standard."

Regulators for directly measuring the volume of draft in coal-burning boiler furnaces were new with Gibson. The advantage of such a regulator over the old pressure-measuring draft regulator is that, regardless of differences in fuel bed resistance, for example, all fires receive the same proportion of air volume to fuel, and consequently burn with the same efficiency. Under normal conditions that advantage is not great. Measured in terms of combustion efficiency, it probably does not exceed a fraction of 1 per cent. The defendant employs both the pressure and the direct volume measuring draft mechanism. The primary means employed by it for draft control is a pressure regulator. The direct-measuring draft-volume regulator is employed for reducing or regulating the draft under abnormal conditions, such as a drop of the grate or a large hole in the fuel bed, and simultaneously warning the operators of the defective condition of the fire.

The defendant asserts that under normal conditions the pressure differentials of the Gibson apparatus will not produce power sufficient to operate a regulator with accuracy, and that the device has "most usefulness under abnormal conditions," where there is excessive flow, and, consequently, greater power. This contention, even if it be sound in fact, does not, however, as I see the matter, take defendant's use of the Gibson device outside the scope of the group of claims now under consideration, or justify defendant's use of that device. Consequently, infringement by defendant must be found, if the claims are valid. Invalidity is asserted upon the grounds that the direct-measuring volume-draft regulator had been long used in blast furnaces and gas producers, as appears from the patents to Rateau, No. 1,080,582, Rusby, No. 1,161,-715, and Rice, No. 919,953, and that the proposal of Gibson to extend the use of the old draft-volume regulator to coal-burning boiler furnaces was not invention. Undoubtedly it was not invention of a high order, but in view of the difference in the incidental problems involved, and the necessary adaptation, I cannot say that Gibson's idea was an obvious one. The invention of Herr, patent No. 1,375,250, measured air volume by draft pressure only, not directly, and consequently did not anticipate this group of claims, whatsoever date his invention is entitled to. I am of the opinion that the claims of this group are valid and infringed.

In his fourth patent, No. 1,537,044, Gibson added to his flow-actuated regulator or controller of his first and second patents a pressure-responsive bellows, to correct for the pressure drift or cumulative errors of his flow-responsive controller, and to eliminate or reduce header pressure variations resulting from load variations. Plaintiffs contend that certain claims of this patent, particularly 23 and 27, are infringed by defendant's compensated controller, which adjusts heat input until heat output is balanced, and further adjusts it until steam pressure is restored. These claims read thus:

"23. The method herein described of controlling combustion in furnaces which consists in normally regulating the supply of fuel and air to the combustion chamber in accordance with the rate of flow of steam from the boiler, and varying the supply of fuel and air in accordance with the variations of pressure of steam in the boiler."

"27. The method herein described of regulating the combustion in furnaces which

consists in regulating the fuel and air supply by and in accordance with changes in the rate of flow of steam from the boiler and changes in the pressure of steam flowing from the boiler.''

In August of 1927 Gibson filed a disclaimer ''to methods of and apparatus for regulating or controlling combustion in a furnace, as specified in claims 22, 23, 27, 28, 29, 30, 31, 32, 33, 35, 36, 37, 38, 52, and 53, of said letters patent, except methods and apparatus wherein the volume of draft through the furnace is controlled by a draft-regulating adjustment the extent of which is determined by the volume of draft, as distinguished, for example, from adjustments of a draft-regulating device to previously calibrated positions as disclosed in the Wilkinson patent, No. 1,093,161.'' The defendant asserts that this disclaimer, as well as that filed to the second claim of the first Gibson patent, is invalid. It contends that all the inferences from the evidence constitute a denial of the existence of any inadvertence, accident, or mistake required by the statute; that the Wilkinson patent was known to Gibson when he originally made the claims now mentioned in the disclaimer, and that the disclaimer is not a mere limiting disclaimer, but is a broadening one.

The view I take of the matter makes unnecessary any consideration of the validity of the disclaimer or claims, for, notwithstanding the great amount of testimony given with respect thereto, I am convinced that defendant's controller is, within any reasonable meaning of the fourth patent, neither in whole nor in part a flow-actuated or flow-responsive device. Defendant's controller has a connection with the steam header identical with that of Gibson's bellows, N, called by Gibson (page 2, line 15) a ''pressure responsive device,'' in contrast with his flow responsive device, L (page 1, lines 91–93). Assuming, without deciding, that defendant's controller produces the same result as Gibson's devices L and N, it functions in an entirely different manner to produce that result and consequently does not infringe claim 23 or 27. This conclusion applies equally to claims 30, 38, and 53 of the fourth patent.

■■ All claims in issue of Gibson's third and fifth patents and claims 19, 22, 52, 56, 58 and 59 of his fourth patent have to do with furnace pressure control. In practice it has been found desirable to have a very slight subatmospheric pressure in the combustion chamber, and to decrease that pressure as the rate of combustion increases. One advantage of a subatmospheric furnace pressure is the avoidance of outbursting jets or flames when fire or inspection doors are opened. Another is the protection of furnace walls against overheating by the infiltration of air through the walls from the outside to the inside of the furnace. As greater wall protection is needed with the increase of rate of combustion, this can be had by bringing about a greater infiltration of cool air through the wall by a decrease in furnace pressure.

Gibson's third patent, applied for in 1915, contains the earliest disclosure of method and apparatus for maintaining in a forced draft boiler furnace a regulated furnace pressure, diminishing with the rate of combustion. There the regulation is accomplished by interrelating the adjustment of inlet and stack dampers, without making them subject to a common master controller. In the fourth patent similar regulation is had by subjecting the intake of air and the effluent gases to a master controller. The fifth patent makes provisions for directly relating the differential between the furnace pressure and the atmospheric pressure to a force responsive to the rate of combustion.

Typical method and apparatus claims of the third patent are 12 and 16, which read thus:

''12. The method herein described of regulating furnaces of a vapor generator operating under forced draft which consists in maintaining in the furnace chamber a pressure less than atmospheric pressure and varying inversely with the demand on the generator.''

''16. The combination with the combustion chamber of a vapor generator operating under forced draft, means for supplying air thereto and means for maintaining therein a pressure below atmospheric pressure and for automatically varying such pressure inversely with varying demands on the generator.''

A typical claim of the fourth patent is:

''19. The method of regulating the furnaces of a plurality of boilers which consists in controlling the pressure of gases in the several furnaces by and in accordance with the rate of flow of steam from all the boilers.''

Claim 16, which follows, may stand for all the claims in issue of the fifth patent:

''16. In a combustion regulating system for a boiler furnace, the combination with means for varying the rate of gas

flow through the furnace in response to a force which is a function of the boiler load, of means tending to maintain a constant vacuum in the furnace, and means responsive to said force for modifying the action of said vacuum maintaining means to procure a predetermined increase in vacuum on a given increase in boiler load.''

The defendant concedes that some of the furnace pressure claims read literally upon defendant's apparatus. It asserts, however, that the applicability rests ''solely upon mere words,'' not upon substance, and that the claims of this group, copied by Gibson mainly from patent No. 1,338,956, to Peebles, Nos. 1,338,922, 1,338,923, 1,338,924, 1,-338,925, and 1,338,929, to Hopwood, and inserted by amendment in the pending applications for the third, fourth, and fifth patents, find no support in the original specifications, and are, hence, invalid. This contention rests upon the fact that Gibson's original applications for the third, fourth, and fifth patents were directed to means to maintain automatically a predetermined ratio between the intake or rates of flow of primary and secondary air; that in the original application for the third there was no reference to furnace pressure, and that in the applications for the fourth and fifth patents he disclosed a purpose to maintain the furnace pressure practically constant.

A proper conclusion with respect to Gibson's right to insert by amendment in his pending applications the claims now under consideration, of course, depends upon a correct major and a correct minor premise, of which the former is a principle of law and the latter a finding of fact. The law applicable to the question is, as I understand it, that an inventor is entitled to secure by a patent his actual invention, as fairly indicated . (Railway Register Mfg. Co. v. North Hudson Co. R. Co. [C. C.] 24 F. 793), or suggested (Hobbs v. Beach, 180 U. S. 383, 397, 21 S. Ct. 409, 45 L. Ed. 586), or disclosed by his original drawings and specifications and that while his application is pending he may make such amendments to his claims, without regard to the nature or scope of the claims originally made, as will secure that end (Heller Bros. Co. v. Crucible Steel Co. of America [C. C. A.] 297 F. 39).

In an interference between Peebles and Gibson, involving Gibson's right to insert in his application for the third patent some of the group of claims here in issue, it was held by the Law Examiner, by the Examiners in Chief, and by the Commissioner, from whose decision no appeal was taken, that Figure 3 of Gibson's drawings disclosed the invention of these claims. I think they were right. Suggestion or disclosure of the invention of the claims by the original specification or other drawings was not essential to the amendment, nor was it material that other drawings showed no concern with furnace pressure in the proportionment of primary and secondary air. In an interference between Hopwood and Gibson, each of the Patent Office tribunals sustained Gibson's right to predicate upon Figure 1, the claims inserted in his application for the fourth patent.

Again I think their finding of fact correct. In the application for the fifth patent, Figure 1 supplied, in my opinion, ample ground for the insertion of the claims in issue. The defendant denies that Gibson invented or had a conception of the subject-matter of these claims. The original disclosures, however, seem to establish that in a patent sense his conception was complete, though perhaps he did not realize it or think of furnace-pressure control as a distinct invention, or thing apart from the proportionment of primary and secondary air, until he saw the patents of Hopwood and Peebles. He then became aware of what he had conceived and disclosed, and so protected it by the claims in suit.

In all of its installations the defendant maintains a slightly negative pressure in its combustion chambers, and in three of its installations the furnace pressure is varied inversely with the load upon the plant. It is true that its pressure has nothing to do with the admission of air above the furnace grate, for it there admits none. It is likewise true that it has nothing to do with the protection by infiltration of its furnace walls, for its walls permit infiltration of air in no perceptible quantity, and that defendant's sole apparent purpose in varying its furnace pressure inversely with plant load is one of safety. But, as the defendant concedes, many of this group of claims read literally upon defendant's structures and steps. While, obviously, this fact alone does not establish infringement (Union Paper-Bag Machine Co. v. Murphy, 97 U. S. 120, 126, 24 L. Ed. 935, Kelsey Wheel Co. v. Universal Rim Co. [C. C. A.] 296 F. 616, 619, Tostévin-Cottie Mfg. Co. v. M. Ettinger Co., Inc. [C. C. A.] 254 F. 434, 435), yet, as a claim for an apparatus or process not specifically confined to its use for a certain purpose may be infringed by the application of such process or apparatus

to purposes different from those described by the patentee, and, as I find nothing in the patents or prior art requiring the broad language of the claims to be limited or given a meaning different from that usually conveyed thereby, a finding of infringement seems to me unavoidable.

■ By counterclaim the defendant charged the plaintiffs with infringement of claims 3, 4, 6, 7, 8, 9, and 10 of patent to Herr, No. 1,375,250, by the "stoker control" mechanism at the Staten Island plant. Claim 10 was withdrawn at the trial. To the counterclaim, the usual defenses were pleaded.

This patent, likewise relating to automatic control mechanism, has for a special object control mechanism which will automatically control the operation of a furnace for steam boilers, by varying the fuel and the air supply to the furnace in accordance with variations in the pressure of the steam generated by the connected boiler, and which will likewise be capable of independently controlling a number of separate mechanisms or devices in response to variations in the result accomplished by the cooperation of all the devices. Claims 3 and 8 may be selected as typical. Claim 3 is:

"In combination in a boiler control apparatus, a fluid pressure actuated control mechanism for controlling the operation of a boiler accessory, a relay mechanism for delivering actuating pressure to said mechanism, means controlled by variations in the steam pressure of the boiler controlled for controlling the operation of the relay, and means responsive to variations in speed of the accessory for counterbalancing the actuating pressure."

Claim 8 reads:

"In combination with a boiler to be controlled, a furnace, a device for controlling the draft delivered to the furnace, and means responsive to variations in the pressure of the steam generated by the boiler and to variations in the pressure of the draft for controlling the operation of the draft controlling device."

The defendant finds in the Herr patent a combination of (1) a device, master controller, responsive to steam pressure variations which produces a control force; (2) a distribution system delivering the varied control force independently to any number of fuel feed and draft regulators; (3) another force, a function of the thing controlled—e. g., speed of stoker or pressure of draft—opposed in each regulator to the master force whereby all the devices are varied together, not to mere calibrated positions, but to produce proportionate effects; and (4) synchronized results far beyond that possible in calibrated regulators, in that each device is controlled by a regulator subjected to the direct opposition of two forces, one the master force, the other a function of the element controlled.

The defendant likewise finds in the furnaces of the Staten Island plant identity of master-controlling force, and its use, identity of control of the stoker, and identity of control of draft. Yet with respect to claim 3, and the more specific claim 4, the defendant seems to me to be on the horns of a dilemma. If these claims be given a narrow or restricted construction, in view of the fact that the patent, acquired by the defendant from the Westinghouse Company after this suit was instituted, was applied for as early as November 6, 1915, granted April 19, 1921, and has made no impression on the practical art of furnace control, unless through infringement by the parties hereto, the stoker control apparatus of the plaintiff, by reason of its widely different form and structure, will be found not within the claims.

If, however, the claims be given a broad construction and held to embrace all boiler accessories operating and functioning in accordance with the spirit and principle of these claims, they were, I think, anticipated by Gibson's abandoned application, No. 716,802, of August 24, 1912. The remaining or draft control claims of Herr find no counterpart in the Staten Island plant. In the latter, damper position, not duct pressure, as in Herr, is the fan control. Again, Herr employed the indirect or pressure method to measure air volume. "Pressure of the draft," in his claims, consequently means duct pressure, pressure below the fuel bed, or "pressure control." In the Staten Island plant "volume control," as distinguished from "pressure control," is employed.

So far as the record discloses, the Staten Island plant was constructed and has been operated by the corporate plaintiff only.

A decree in conformity herewith may be presented.