## RUBENSTEIN v. SLOBOTKIN.

District Court, E. D. New York.   June 22, 1929.

No. 3814.

Mock & Blum, of New York City, for plaintiff.

Louis Schumacher, of Brooklyn, N. Y., for defendant.

CAMPBELL, District Judge. This is an action in equity in which plaintiff prays for relief by injunction, accounting, and damages for the alleged infringement by the defendant of patent No. 1,672,040, issued by

the United States Patent Office to Nathan Rubenstein, for steam-pressing iron, dated June 5, 1928, application filed July 17, 1925.

The defense urged on the trial was invalidity, and a counterclaim was interposed by the defendant of the alleged infringement by the plaintiff of claim 1 of reissue patent No. 16,847, issued by the United States Patent Office to Nathan Slobotkin, for sadiron, dated January 10, 1928, application for reissue filed December 9, 1926. The original patent was No. 1,548,957, dated August 11, 1925, application filed March 8, 1924.

The iron of the patent in suit is used for pressing garments.

Formerly it was necessary to sponge the goods and then apply an iron.

Plaintiff had an iron on the market prior to the iron of the patent in suit, in which steam was generated in a separate boiler, and was led into the iron to heat it, and deliver steam to moisten the cloth, but this did not meet with great success, nor did it solve the problem, because it was cumbersome, and occasioned a comparatively large expense, not so much for the iron itself as for the boiler and installation.

Attempts had been made since 1910 to make a water iron, also called a hydro-iron and a sadiron, and, unless the defendant can show that he made the iron he claims in 1922, the patented iron of plaintiff was the first successful iron of this type.

Plaintiff had, prior to putting out the iron of the patent in suit, endeavored to market an iron having a base made of three pieces, but these pieces burst, and the device was a failure.

Three things were required to be accomplished by the iron to insure its success: (1) It must moisten the cloth so as to soften it, and thus do away with the necessity of using a sponge; (2) smooth the goods; and (3) dry the goods, for, unless the goods are dried, the pressing operation is useless.

These things were accomplished by the plaintiff in the patent in suit, which shows an iron with a base made of a single integral casting, which is provided with a steam channel centrally located, and which extends from the toe of the casting to the rear thereof. The ends of this central longitudinal steam passage are closed by plugs. The water channel is laterally located, and is parallel to the steam channel, and is L-shaped, so that the water passes through a channel having the greatest possible length considering the dimensions of the iron.

The steam channel is provided with perforations at its bottom, and these perforations are closed by hollow nipples, but water cannot pass through the hollow nipples, unless the level of the water allowed by the operator to enter the device is above the tops of the hollow nipples.

The transforming of the water into steam takes place below the flame, as the burner is directly above the steam passage, the central portion and hottest part of the iron.

The particular advantages of this construction for pressing seams of garments are many, among which are the following: The solid casting readily conducts heat from the burner through the whole casting, and the water is preheated in the water channel before it reaches the steam channel, and is changed into steam without cooling the central zone of the bottom casting to such an extent as to make it impossible to dry the seams.

The intense heat produced along the central line of the casting due to the direct contact with the flame of the burner superheats the steam so as to make it dry and hot, while, the flame being downwardly directed, the top of the bottom casting remains cooled, and the heat is not communicated to the hand of the operator, as it would uncomfortably be if the flame was below the chamber in which the steam is generated.

■ Seventeen patents including the original patent issued to defendant, No. 1,548,957, were cited as references in the passage of the patent in suit through the Patent Office, showing that it was considered with great care, and this coupled with the fact that the patent was granted by the Board of Appeals, enhances the ordinary presumption of patentability arising from the grant. J. A. Mohr & Son v. Alliance Securities Co. (C. C. A.) 14 F. (2d) 799; Folberth Auto Specialty Co. v. Mayo-Skinner Mfg. Co. (D. C.) 292 F. 883.

Defendant on the trial raised the question of the necessity of the filing of a supplemental oath by the plaintiff.

■ I do not believe that any supplemental oath was required, because claims can be varied at will without a supplemental oath, as long as nothing is added to the original disclosure (Gibson v. Smoot Engineering Corporation [D. C.] 28 F.(2d) 123), and I do not find any such addition in this case.

■ No fraud is shown, and the recitals of the letters patent are conclusive evidence of the taking of the necessary or statutory oaths. Westinghouse Electric & Mfg. Co. v. Metropolitan Electric Mfg. Co. (C. C. A.) 290 F. 661.

Even if a supplemental oath was required,

the oath contained in the affidavits verified by the plaintiff on November 5, 1925, September 14, 1926, and February 28, 1928, respectively, were sufficient.

The following patents were offered in evidence by the defendant to show invalidity because of prior knowledge and lack of invention thereover, all of which had been cited as references by the Patent Office:

German patent No. 335,547, to Mahlmann, dated April 6, 1921, shows in Fig. 1 a device provided with a water reservoir 5, closed by a cover 6, having a handhold 7. The steam generated in chamber 5 passes through pipe 10 to the hollow perforated base. The burner 20 which produces the steam is located below the boiler.

United States patent No. 1,150,355, to French, for garment pressing machine, dated August 17, 1915, a very remote reference, shows a vertical steam pipe 24, communicating with the base, said steam pipe 24 being connected to a cross pipe 28, having a nipple 29, which communicated with steam reservoir 22, below which were located electric heating coils 42.

United States patent No. 1,503,501, to Hoffman, for pressing implement, dated August 5, 1924, shows a coil 11 through which the water and steam were caused to pass, and a burner 32 in the center of the coil.

United States patent No. 873,202, to Avery, for flatiron, dated December 10, 1907, shows an electric iron. It does not state the location of the electric heating coil. The water passage 14, and the steam passage 18, are both confined to the toe of the iron, and each is sharply inclined to the longitudinal axis of the iron.

United States patent No. 1,521,058, to Walker for pressing iron, dated December 30, 1924, a very remote reference, shows an electric iron with a casting 22, in a recess of which 27 the water is collected. The water is heated through the plate 24, which is not integral with the casting 22, and is intended to protect the electric heater 2 from the vapor.

United States patent No. 976,571, to Hull, for steam pressing and finishing iron, dated November 22, 1910, a very remote reference, shows a base divided into two compartments, 11 and 12, by a horizontal partition 13. In the bottom compartment 12 is a gas burner 24, the flame of which is directed upwardly against the partition 13 to vaporize water trickling down from the perforated pipe 21.

United States patent No. 819,761, to Johnson, for flatiron, dated May 8, 1906, shows a base made of two pieces m and n, with a water passage p, centrally located above the steam channels o.

United States patent No. 1,516,923, to Hoffman, for pressing implement, dated November 25, 1924, shows a structure similar to that shown in United States patent No. 1,503,501, to Hoffman, with a coil 38, through which water or steam is caused to pass, and a burner 20 in the center of the coil.

United States patent No. 1,548,957, to Nathan Slobotkin, for sadiron, dated August 11, 1925, application filed March 8, 1924. The three claims of this patent relate solely to a control of the steam escape which is not used by either of the parties herein, and shows that defendant did not invent the subject-matter of the claims in issue, because, after describing generally in his specification the article in controversy, he stated:

"In so far as I have now described my improved iron it does not differ materially from similar irons now on the market, but in these irons the amount of water vapor delivered to the ports J J, can be controlled only by manipulation of the inlet valve."

The Board of Appeals decided that the plaintiff was entitled to make the claims of the patent in suit, and this is controlling, unless the defendant can show priority of invention by testimony which "carries thorough conviction." Perry Auto Lock Co. v. Security Lock Co. (C. C. A.) 286 F. 101, 104.

Defendant testified that some time in 1922 he took an ordinary gas iron, and had a mechanic drill holes so as to transform it into a hydroiron, but on cross-examination testified that he had the mechanic make only one hole.

Neither the iron nor a duplicate was produced, and defendant testified that he only made it "for experience."

Defendant further testified that he remembered the date when he made the alleged iron, as it was three or four months before he made the first contract with Mr. Rubenstein. If this be true, it could not have been made in 1922, as the date of the first contract with Mr. Rubenstein was the 14th day of November, 1923.

Mr. Will, the mechanic referred to by the defendant in his testimony, testified the casting was hollow, and there was a core so that the heat of the burner entered the bottom hollow part in a cross-base. He further testified as to the year in which he said he did the work, "I only can go according to my recollection, what I recall in that year, I have no absolute proof, no bill or anything I could show."

Mr. Ouczarsky testified that he never sep-

606

arated the parts of the iron which he claimed was tested by Mr. Slobotkin in 1922.

This character of testimony falls far short of that required to antedate a patent.

The defendant first got in touch with the plaintiff through an advertisement dated September 19, 1923.

The defendant is in error when he said that plaintiff at that time was making a hydroiron in which the water passage and steam passage were confined to the toe of the iron.

Plaintiff was at that time making his commercial device, Exhibit 5, with a base made of a solid casting, and was not making the iron with a plurality of plates shown in patent No. 1,385,646; and this appears from the testimony of the defendant, who said that the iron which he agreed to sell for Mr. Rubenstein in 1923, when he first came to him, had a base made of solid casting.

The contention of the defendant that he told the plaintiff how to make the iron of the plaintiff is obviously erroneous, because from the books of the plaintiff it appears that the plaintiff made his first sale of the iron, Exhibit 5, on October 17, 1923, and had not met the defendant until after the date of the advertisement, September 19, 1923; and I am sure that plaintiff could not have put the iron into production and made the sale in question in less than one month.

The testimony of the foundryman, Litman Rubenstein, is convincing that the iron could not have been put into production at that time.

The testimony of both Marcy A. Rubenstein and the plaintiff is very convincing, in view of the sales records produced, and it seems certain that plaintiff began to work on the pattern for the iron in question in July, 1923.

The defendant accepted employment with the plaintiff as a salesman, and worked for him for four years, two contracts of employment being in evidence, and during all of that time he made no claim of being an inventor of any part of the device now in issue.

It is true that defendant tried, in the latter part of February, 1924, to interest the plaintiff in an undisclosed invention, but it was not until after he had been to Albany after that time that he showed plaintiff the claimed invention, and thereafter plaintiff made up irons and gave them to the defendant to place, and told him that, if they were a success, they would see about it. The cost to the plaintiff of making these irons was over $400, but they did not work.

The exhaust on those irons was the kind shown in patent No. 1,548,957.

Plaintiff's date of invention was in July, 1923, and the sale of irons like Exhibit 5 prior to March 8, 1924, is clearly shown; but defendant has offered no convincing evidence which would carry back his date of invention prior to the date of the filing of his application, March 8, 1924.

Another convincing piece of evidence is that in the defendant's reissue patent No. 16,847, the application for which was filed December 9, 1926, the same disclaimer is found, in the same words as in the original patent, No. 1,548,957.

The inference which the defendant seeks to draw from the size of the commission paid him, that it was for the use of his invention, seems far-fetched, when you consider that every iron sold by him while in the employ of the plaintiff was marked as plaintiff's patented iron.

The failure of the plaintiff to contest interference No. 53,347 does not tend to support defendant's contention, because the only claims in issue were the three limited claims of the original Slobotkin patent, No. 1,548,957, which related solely to permitting the steam to exhaust into the atmosphere, and plaintiff believed this idea had no commercial value.

Defendant raises a question of what he considers improper marking of the plaintiff's iron, which he sold for the plaintiff, and attempts to excuse his failure to claim the invention of the plaintiff's iron, during the time he was in plaintiff's employ, because of such marking.

False marking is not a defense to an infringement suit brought in equity. Folberth Auto Specialty Co. v. Mayo-Skinner Mfg. Co. (D. C.) 292 F. 883. If a layman honestly believes that the article which he is putting out is covered by a patent, then no law is violated if his belief proves to be erroneous.

The plaintiff had not at that time even filed his application for the patent in suit, but he had received a patent No. 1,385,646, which in Fig. 3 shows a nipple 37, which was intended to prevent water from leaking out of the perforations 41, on the bottom face of the iron.

Plaintiff's iron in issue resembles the iron of the patent No. 1,385,646 only in the use of a nipple to prevent an overflow of water from passing out of the holes in the bottom

of the iron, and plaintiff in good faith believed that for that reason he had the right to mark the irons under that patent.

There is nothing in the prior art shown which anticipates the plaintiff's patent in suit, and plaintiff clearly is entitled to priority over the defendant.

█ The patent in suit, issued to the plaintiff, No. 1,672,040, is valid.

This suit is based on all four claims of the patent in suit.

Claim 1 reads as follows:

"1. A hollow steam iron having a bottom casting, a gas heater located above said casting and adapted to heat the same, said casting having a water inlet passage laterally spaced from the longitudinal central line of said casting, said casting also having a steam passage communicating with said water inlet passage, said steam passage having openings communicating with the bottom of said casting in the central portion of the bottom of the casting."

Claim 2 differs from claim 1 only in the added provision, "said gas heater being located directly above said central portion of the bottom of the casting."

Claim 3 reads as follows:

"3. A hollow steam iron having a bottom casting, a gas heater located above said casting at the central part thereof, and adapted to heat the same, said casting having a substantially longitudinal water inlet passage laterally spaced from the longitudinal central line of said casting, said casting having a longitudinal and centrally located steam passage communicating with said water inlet passage substantially at the inner end of said water inlet passage, said steam passage having openings communicating with the bottom of said casting in the central portion of the bottom of the casting."

Claim 4 reads as follows:

"4. A hollow steam iron having a bottom casting, a gas heater located above the central longitudinal portion of said casting and adapted to heat the same, said casting having a substantially longitudinal water inlet passage opening from the rear thereof and laterally spaced from the central longitudinal part of said casting, said casting also having a substantially longitudinal and centrally located steam passage communicating with said water-inlet passage, said steam passage having openings communicating with the bottom of the casting, said openings having therein hollow members projecting above the bottom of said steam passage."

There is no necessity for any extended discussion as to infringement of the patent in suit, because in the brief submitted by counsel for the defendant infringement is admitted, if the patent be valid. It suffices, therefore, to say that the embodiment of the defendant's device shown in the upper left-hand corner of plaintiff's Exhibit 3 infringes upon claims 1–3, and the device shown in the lower left-hand corner of that exhibit infringes upon all the claims of the patent in suit.

█ We now come to the consideration of the counterclaim interposed by the defendant that plaintiff infringes claim 1 of reissue patent No. 16,847, issued to the defendant for sadiron, dated January 10, 1928, on application for reissue filed December 9, 1926, which claim 1 reads as follows:

"1. In a sad-iron, a solid base having a vaporizing chamber and a distributing chamber spaced laterally from and communicating with the vaporizing chamber, said vaporizing chamber having a water inlet thereto, said distributing chamber having discharge openings through the working face of the iron, means for checking the flow of water to said discharge openings while permitting the free passage of vapor therethrough, and heating means for vaporizing the water in the vaporizing chamber and at the same time heating any vapor in the distributing chamber."

The plaintiff's device has been fully described.

Claim 1 of the reissue patent of the defendant, No. 16,847, includes the following necessary element, "means for checking the flow of water to said discharge openings while permitting the free passage of vapor therethrough.'

Fig. 3 of that patent shows a water channel $F$ in which the water was vaporized, connected to a steam channel $H$ by vertical pipes $g^2$ and $g^3$, connected by a horizontal pipe $G$, and the specification states that the cross port $G$ is at a higher level than the chambers $F$ and $H$, and further states:

"The ports $g^2$ and $g^3$ together with the cross port $G$ provide a water-flow checking means, which permits the vapors to freely pass to the distributing chamber but which restrains the flow of water to the distributing chamber."

In plaintiff's device shown in plaintiff's Exhibit 4, no means are shown for checking the flow of water from the water channel to the steam channel, as both are on the same level with the cross channel, and it only has hollow nipples to prevent water from leak-

ing out of the iron, and therefore does not infringe claim 1 of defendant's reissue patent.

The use of a hollow nipple in the steam channel to prevent water from dripping out of the openings in the bottom of the iron, unless the operator carelessly floods the iron, is shown in United States patent No. 976,571, to Hull, and United States patent to Walker, No. 1,521,058.

This also appears from the file-wrapper and contents of the reissued patent, in which as a result of rejections of claims and amendments, it is clearly indicated that claim 1 cannot be construed broadly enough to cover a mere passage. The expression "means" can only cover the specific thing shown in the description and drawing, together with a fair range of equivalents. Henry v. City of Los Angeles (C. C. A.) 255 F. 769.

The hollow nipple of plaintiff's device is not an equivalent of the "means" specified in claim 1 of the reissue patent.

. The plaintiff does not infringe.

The reissue patent granted an enlarged claim, the device manufactured and sold by the plaintiff was not covered by the limited claims of the original patent, and was manufactured and sold by the plaintiff, defendant acting as his salesman, from prior to the date of the application of the original patent to the date of the application for the reissue patent; and, even if the device of the plaintiff was covered by the enlarged claim of the reissue patent, which I have held it was not, still the plaintiff would have an equitable license to continue the manufacture and sale of such device. Autopiano Co. v. American Player Action Co. (C. C. A.) 222 F. 276.

The failure of the defendant to assert patent rights against the plaintiff, his employer, for four years, during all of which time he was selling for plaintiff the goods which he now claims infringe his patent, shows that he abandoned such rights. Victor Talking Mach. Co. v. Brunswick-Balke-Collender Co. (D. C.) 290 F. 565, 575, affirmed (C. C. A.) 8 F.(2d) 41.

All of the claims of the plaintiff's patent in suit, No. 1,672,040, are valid and infringed by the defendant, and claim 1 of defendant's reissue patent No. 16,847 is not infringed by the plaintiff.

A decree may be entered in favor of the plaintiff against the defendant for an injunction, accounting, and damages, with the usual order of reference, and dismissing the defendant's counterclaim, with costs.