**BRAGG–KLIESRATH CORPORATION v. WALTER S. VOGEL & CO., Inc.**

**No. 132.**

Circuit Court of Appeals, Second Circuit.

Nov. 6, 1933.

Albert F. Nathan, of New York City (Border Bowman and Elmer R. Helferich, both of New York City, of counsel), for appellant.

Louis Prevost Whitaker and Livingston Gifford, both of New York City, for appellee.

Before MANTON, L. HAND, and SWAN, Circuit Judges.

L. HAND, Circuit Judge.

This is the usual suit in equity upon a patent which was before us in the case of Bragg-Kliesrath Corp. v. Farrell, 36 F.(2d) 845, and which we then held valid but not infringed. It disclosed an improvement upon the power brake disclosed by the patent to Dickson, No. 1,076,198, though not, like his, specifically adapted to motorcars. We may refer to our earlier discussion of Dickson's patent, and say no more here than that it disclosed a device by which the manifold of the engine might be connected with a cylinder and piston, so that one side could be exhausted. The atmospheric pressure on the opposite face of the piston would then move it, and this motion was used by appropriate mechanism to set the brakes. For a release it was only necessary to introduce air into the piping which led to the cylinder, changing the partial vacuum to atmospheric pressure and allowing the piston rod to retreat under the action of the pedal. To connect the intake of the cylinder with the manifold and the air alternatively, Dickson used a three-way valve, so that when the manifold was sucking, the air inlet should be closed, and when air was coming into the cylinder the manifold should be shut off. The valve could be operated independently of the throttle by a mechanism not necessary to disclose, and it was possible, if the adjustment was delicate enough, to hold it in mid position so as to maintain any existing pressure without the admission of air, which would destroy the vacuum; and without further sucking by the manifold, which would increase it. Thus, if the valve control was nicely enough handled, pressure could be built up by successive increments, and the brakes could be set gradually. Similarly they could be released gradually, air being admitted in small quantities

and at once cut off again, at the will of the driver.

The device was new and the idea proved valuable, but in practice it was hard to manage, for the adjustment of the valve as disclosed was very troublesome especially on a rough road. Root's patent was to avoid this difficulty by a device which would automatically close the manifold intake after a given increment of pressure, and hold it until the driver wished to set the brakes more firmly, or to release them. For this purpose he disclosed a valve made of three discs, set face to face upon a common axle, and held together by an appropriate spring. Of these the inside one was fixed against rotation, and had three openings, one connected with the manifold, one with the atmosphere, and the third with the cylinder. The next or middle disc could be rotated manually, and had two openings which could register, one with the manifold opening in the fixed disc, and the other with the cylinder opening; when so set, a port was clear to the manifold and another out of the cylinder. To make an air-tight connection between these two ports, Root used a third disc set outside the moving one. It was hollowed out on its inside face, and had a circumferential flange which made a chamber through which the manifold could suck air out of the cylinder. The vacuum so created was maintained as follows. The inside of the last disc described was not hollowed out through its whole circumference. Root left a segmental section, flush with the inside of the disc, and large enough to cover the port to the manifold. Assuming that connection was made between the manifold and the cylinder in the way just described, it could be shut off and the vacuum maintained, if the outside disc was rotated until the segmental section registered with the port to the manifold. To do this automatically, the disc must be connected with the piston, moving the segment into "cut-off" position with its motion. To this end a lug was added to the disc, its end being connected with the piston rod by a lost motion slot and pin. Thus as the rod was drawn back, it moved the lug and turned the disc; the "cut-off" segment being so placed as to stop the port to the manifold at the end of the rod's movement.

In this way the driver by rotating the mid disc so as to "crack" the opening of the fixed disc into the manifold, could create a partial vacuum which would be at once cut off and fixed by the advance or "follow-up" of the outside disc. A further rotation of the mid disc would add to the vacuum, which would again be maintained by a further rotation of the outer disc; and so on until the openings in the fixed and mid discs were in complete register when the maximum vacuum would result. Thus the brakes could be set by cumulative increments of pressure. They were released by rotating the mid disc until one of its openings—that used to register with the port to the manifold—registered with the port out of the cylinder. In that position the other opening registered with a third opening in the fixed disc which was a port to the air, the channel in the outside disc forming a connection between the two. Root did not provide for a gradual release of the brake.

■■ We have considered the validity of the patent before, as against all the references now at bar except Atkins, No. 88,431. We deem it unnecessary to go over them again, for Atkins clearly did not anticipate the disclosure made. But it is another matter how far the claims, which verbally cover the defendant's apparatus, will bear such an extension beyond the device disclosed. Patent claims are peculiar in that in a proper case courts will save them by limiting their expressed intent to so much of the field as the prior art leaves open; this is the converse of the doctrine of equivalents. Their intent is at once compressible and expansible, and courts go far to save them; so far, indeed, as to make them an anomaly among written instruments. To learn what is the allowable scope of Root's claims we must therefore find out what was left open in the art for such an improvement, and whether the defendant's device was within what had been already occupied, or what Root invented. That depends in the first place upon how far, when his disclosure is read abstractly, any invention remains. Certainly he was the first to conceive of improving Dickson's disclosure by making possible an automatic cumulation of separate increments of pressure. We held in Bragg-Kliesrath v. Farrell that merely as such, the conception was not an invention; and indeed it might well occur to any one who tried to use Dickson's brakes. Again we held that it was not invention to make the automatism depend upon the movement of the piston as the brakes set. It is hard to see how it could have been otherwise arranged. We are therefore concluded, except the result is achieved by means substantially like those employed by Root for the first time. We turn to the defendant's apparatus, since on the issue of infringement it is this which should be compared with the prior art.

In principle its brake is like Dickson's; that is, it operates by sucking air from one side of the cylinder and letting it in again for a release. The question is as to the "follow-up" mechanism. The valve as a whole is made up of a casing fixed upon a rod which moves back and forth with the brake rod. Within the casing is a valve, a cylinder which slides longitudinally inside it, not by the motion of the brake-rod, but only by that of the pedal. The casing has three ports, one to the air; the other, to the manifold; a third, to the piston cylinder. When the brakes are off air comes in through the air port and an opening in the valve cylinder which is then in registry with that port; it passes through the centre of the valve cylinder, and out through the third port of the casing to the piston cylinder. Both sides of the piston are at atmospheric pressure. When the pedal is pushed down the valve cylinder slides in the casing, so as to put its air opening out of registry with the air port and shut off the atmosphere. Very shortly after the air port is covered, the port to the manifold is cracked and the manifold begins to suck. This moves the piston rod to which the casing is fixed, and pushes the casing forward, effecting a partial restoration of the relative positions of valve cylinder and casing at the outset. If the casing overran enough, not only would the manifold port be closed, but the air port would crack into the air opening in the valve cylinder, and the pressure be correspondingly reduced. This the defendant says is what happens, and that the casing will oscillate under the shocks of the road, the pressure being reduced each time the air port is cracked. The chance of an overrun depends upon the so-called "lap" of the valve cylinder; which means the amount by which the distance between its end and the nearer edge of its air opening, exceeds that between the outer edges of the air port, and manifold port, of the casing. However, too slight a lap would scarcely avoid infringement, for the casing is intended to hold any pressure set up, and will do so except under shocks or jolts, though then perhaps not very effectively.

To release the brakes, the pedal is returned by its spring, and with it the valve which cracks the air port; by the resulting reduction of vacuum the brakes will be unset. Theoretically at any rate, this should move back the casing and hold what pressure remains, so that there could be a gradual or complete brake release, at the option of the driver.

It is apparent that in detail the two apparatuses are entirely unlike; they have in common only Dickson's idea which was prior art, and the idea of an automatic cut-off operated by the piston, which we held insufficient for invention. The art contained contrivances closely like the defendant's for holding a given pressure and realizing an accumulation of increments of pressure. This was earliest disclosed in Atkins, No. 88,431. The use was very different, but the disclosure was in substance the same, except that the movement of the cylinder, not the piston-rod, effected the cut-off; the piston being fixed, its rod abutting upon the frame. A rod attached to the opposite end of the cylinder moved with it, and this was the force used upon the work. The source of power was any fluid under pressure, entering the cylinder on either side of the piston, and escaping from the other side. Important for our purposes is the mechanism by which increments of pressure could be cumulated, each increment being held. Above the cylinder, but fixed to it, was a valve casing, connecting with the source of power through an appropriate port, and with the cylinder by two ports at opposite sides of the piston. Within this casing was a valve independently movable by a lever; when it was set to cover the ports to the cylinder, no fluid entered, and the piston was under no pressure. When, however, the valve was moved to uncover the port on one side, the fluid would enter and press that end of the cylinder away from the piston. At the same time the valve, covering the opposite port of cylinder was unseated, allowing the escape of the fluid to the waste pipe. The movement of the cylinder and casing necessarily moved the port with them, and when the port reached the valve, the valve closed it, cutting off the flow of the liquid and fixing the pressure. A second movement of the lever would repeat the process, and thus cumulative increments could be built up as desired. To change this into the defendant's device it was necessary to separate the casing from the cylinder, connect it with the piston rod, and make the piston move. As will appear, the substance of all these things was done later in the art.

The plaintiff challenged the availability of Atkins as a reference, chiefly on the theory that the valves there disclosed exactly covered the ports without "lap," and that for this reason it was unsuitable for such uses as a motorcar; it was in instable equilibrium. That, as we have seen, is the defendant's position as to its own valve and casing. It is apparent that in all such devices, if the movement of the piston-rod stops at the absolute instant when the pressure is off, no overrun is

534

possible, and the valve is liable to crack at any shock or jar. This applies as well to the defendant's valve as to Atkins. If we are to admit any overrun in one case, we must in the other. True, Atkins showed no "lap," and if this is to be taken as fatal, there might be trouble. But patent drawings are notoriously not to be taken literally, and it seems to us inconceivable that if, when the contrivance was applied to machines subject to shocks or jars, the absence of a "lap" proved a difficulty, it would not have been corrected.

Howe & Clark, No. 530,994, disclosed a somewhat similar mechanism, capable of building up pressures incrementally through the action of the piston-rod. The "follow-up" member was here inside the valve, which was itself cylindrical and within a casing. If the pressure pipe were a suction, and the escape vent open to the air, the device would operate like the defendant's. We said in Bragg-Kliesrath v. Farrell that except for this substitution the reference would have been "close to what Root achieved by a rotary follow-up element." We did not mean that Root's patent would have been then invalid, however limited; nor could we have meant to rely upon the substitution of suction, for Dickson had already disclosed that. In this reference the piston moved, not the cylinder; the piston-rod moved the "cut-off."

Wadsworth, No. 203,224, contained a "follow-up" member used for the same purpose, but we need not stop to describe it, because Casey & Cavin, No. 1,082,733, is more pertinent. This was a valve for reversing the flow of steam to opposite sides of a locomotive piston. Again, the substitution of withdrawing and admitting atmospheric pressures to one side of a piston is too closely analogous, after Dickson, to make the difference important. The disclosure was in several forms, the nearest to the defendant's being figure six. Like Howe & Clark, the "follow-up" member, actuated by the piston, was inside the valve, itself a hollow member, and both were within an immobile casing. But these are mere accidents of design; the important fact being that the valve opens the port manually, and the opening is in turn shut off by a "follow-up" member, moved by the piston. Perhaps it was not necessary to add Atkins to these two references, but if there was anything in designing the mechanism so that the casing should move, Atkins disclosed it. Having once held that invention could not reside in the mere notion of an automatic cut-off actuated by the piston, we must find some borrowing of the details by which that result was

accomplished. The defendant did not so borrow; like Farrell, it took a mechanism, which, though not precisely like any which preceded, was in direct descent from several. The art was free to make any automatic cut-off so actuated except Root's; it was free to adopt any existing means, and to make these over so long as it kept away from Root's means. So it seems to us that, having once declined to allow patentability to the general idea, this suit is in substance the same as the former. There is no injustice in this. Root's actual disclosure has never been extensively used; the trade has turned to the kind of cut-off before known.

Decree reversed; bill dismissed for non-infringement.