BUONO et al. v. YANKEE MAID DRESS CORPORATION.

SAME v. LOO–ROSE DRESS CO., Inc.
SAME v. STRUNG et al.

Nos. 7085–7087.

District Court, E. D. New York.
July 31, 1934.

794

Mock & Blum, of New York City, for plaintiffs.

Knight Bros., of New York City (Ray T. Ernst, of New York City, of counsel), for defendants.

CAMPBELL, District Judge.

The three above-entitled actions were by stipulation consolidated and tried together.

The actions are brought for relief by injunction, accounting and damages for the alleged infringement of claims 5 and 6 of patent No. 1,926,644, issued by the United States Patent Office to Julius Buono and Mario Buono, for sewing machine, granted September 12, 1933, on application serial No. 569,234, filed October 16, 1931, and of all the claims of patent No. 1,926,761, issued by the United States Patent Office to Julius Buono and Mario Buono, for stitched fabric article, granted September 12, 1933, on application serial No. 657,522, filed February 20, 1933, being a continuation of application serial No. 569,234, October 16, 1931.

The defenses of invalidity and noninfringement were interposed by the several defendants.

The patents in suit are owned by the plaintiffs Julius Buono and Mario Buono, and the plaintiff U. S. Blind Stitch Machine Corporation is the sole licensee of such owners.

Before proceeding to consider the questions of validity or infringement it will be well to dispose of two other defenses.

The defense of unclean hands, based on a failure to mark the country of origin on machines manufactured in Germany, before the patent was granted, is not sustained. The failure to obey some customs law with reference to machines not manufactured under the patent, but before the patent ever issued,

could in no way have injured these defendants, nor is such action in any way connected with the matters here in issue. In fact, Exhibit G, referred to, does have marked on it the word "Germany" as the country of manufacture.

The fact that the word "patented" may have appeared on one machine manufactured before the patent was granted does not of itself show an act out of accord with good conscience; nor was there any evidence of any injury to or misleading of the defendants thereby.

The putting on of the notice of patenting may be ground for penalty, but it is not ground in a private litigation.

Furthermore, the defense of unclean hands has not been pleaded, and therefore cannot be urged.

The defense of nonjoint invention has not been pleaded, and therefore cannot be raised. Walker on Patents (6th Ed.) § 640; Hopkins on Patents, vol. 1, p. 431.

This objection was made by counsel for plaintiff on the trial, and no request was made by the counsel for defendants on the trial for leave to amend. The motion now made for leave to amend comes too late, as in districts like this, overburdened with work, a suit should be tried once. The granting of this motion would necessitate the reopening of the trial to allow plaintiff to at least call the other individual plaintiff.

The motion is denied for the reasons stated, and also because the evidence does not warrant the granting of the amendment to conform to the proof.

In any event, I am satisfied from the evidence that both of the individual plaintiffs did contribute their ideas, and one did the mechanical work, and I can find nothing disingenuous or calculated to mislead the defendants in the actions of the individual plaintiffs. Butler v. Bainbridge (C. C.) 29 F. 142; Consolidated Bunging Apparatus Co. v. Woerle (C. C.) 29 F. 449; Cheshire v. Cox Multi-Mailer Co. (C. C. A.) 229 F. 415; Kane v. Steinmetz, 52 App. D. C. 279, 285 F. 1013, 1014.

The suggestion by defendants that joint invention of patent No. 1,926,761 was impossible is not convincing, as I see no reason why this could not be a joint idea, as it is for a combination involving the following ideas: Using interlaced chain loops, having these loops overlap the edge of the hem, and causing some of these loops to extend through and through the base layer.

Both of the patents in suit were issued on the same day, September 12, 1933; patent No. 1,926,761 being issued upon an application which was a continuation of the application for No. 1,926,644, therefore both patents in suit are to be considered as a single patent. Benjamin Electric Manufacturing Co. v. Dale Co. (C. C. A.) 158 F. 617.

It is stipulated: "That American Blind Stitch Machine Company is a corporation organized and existing under the laws of the State of New York, is the manufacturer of the sewing machines, the use of which by the three defendants is the basis of the charge of infringement; and that the American Blind Stitch Machine Company is assuming the entire defense and is in full control thereof."

Patent No. 1,926,644 is for an improvement upon that type of blind stitch sewing machine which was originally devised by Dearborn, who is the inventor associated with American Blind Stitch Machine Company.

As to patent No. 1,926,644.

In the machine of the patent in suit No. 1,926,644, there are two gears that run in mesh; a small gear mounted on the main shaft, which drives a larger gear, of two-to-one ratio, and that larger gear carries an eccentric. That eccentric causes a rocking action of a connection through a link on the push rod, which presses against the end of the work table pushing it down. A spring tends to hold the work table in against that rod so that the two-to-one action thus remains down two stitches and is pushed up for one. The work table is supported on two bearings so that it can be pivoted, the bender is separate on a rod, and rotated for each stitch. The rib or member which forms the bight in the cloth is mounted upon the work table. If the horizontal part of the table is depressed, it carries the rib along with it. The work table is pivoted so as to get a rocking movement, and this is accomplished by a cam or eccentric motion which is operated by reduction gearing from the main shaft.

This is exemplified in the following enumerated figures of the said patent in suit.

Fig. 1 shows the work support 4, which is specifically referred to as the work holder or the work support (page 2, lines 17–19).

Fig. 10 and Fig. 11 show the member 22, which is referred to as a rib (page 1, lines 107–109).

This rib forms the bight or node in that portion of the work in which the stitch is to be formed. This node or bight is formed in the edge of the piece or pieces of material which is generally supported upon the member 4.

Figs. 12 and 13 show the rib 22 mounted upon a rock shaft 31.

Fig. 7 shows a lever 28, by means of which the rock shaft 31 is given its rocking movement. The lever 28 is integral with an eccentric strap 27, and this strap is operated by means of an eccentric 26a which is upon the main shaft.

In Fig. 4, the work support 4 is shown mounted upon a shaft 5, and automatic mechanism is shown whereby the work support 4 is automatically turned at predetermined intervals in the counter clockwise direction in order to depress the top surface of said work holder 4.

Fig. 3 and Fig. 7 show a suitable eccentric which actuates the arms 34 and 35, and in Fig. 7 the said arms are shown as connected by means of a pin 41, to a link 42, said link 42 being pivotally mounted at 45 to adjusting means, and at 43 pivotally connected to a horizontally movable rod 44, which is also shown in Fig. 8, and as so shown when the rod 44 is moved to the right, it pushes against the depending portion of the work holder 4, so as to depress the work supporting surface of the work holder 4.

Fig. 7 shows a large gear 39, by which the eccentric, which periodically turns the work holder 4, is driven, and this gear turns once for every two complete revolutions of the main shaft 1, but any other suitable ratio can be provided. Fig. 10 and Fig. 11 illustrate the skip stitch which is produced as the result of the described operation.

In turning the work holder 4 about the shaft 5, the rib 22 and its shaft 31 are moved in unison with the work holder 4, because the shaft 31 is mounted in bearings which are connected to the work support 4.

Therefore, the turning of the work support 4 does not change the relative distance between the top supporting surface of the work support 4, and the top surface of the rib 22.

Fig. 10 shows that when the supporting surface of the member 4 is in its upper position, the curved needle passes through all the layers of the fabric.

Fig. 11 shows that when the top surface of the work holder 4 is depressed, by means of the pushing movement of the rod 44, which is shown in Fig. 7 and Fig. 8, the needle passes through the upper layer or layers of the material, and in this stroke the needle skips or misses the base layer of the fabric.

Figs. 14–19 illustrate the sewing of a sheet of material having a hem which is provided with an inturned edge. In Fig. 15 are shown the stitches 10a which pass through all three layers of the fabric, and in Fig. 16 are shown the stitches 11a which pass through the two upper layers of the material, skipping the base layer A.

Fig. 19 shows that the periodic turning of the work holder 4 causes the stitches 10a to show loops which are spaced from each other so as to simulate the effect of hand sewing.

Fig. 15 shows the loops which are slightly spaced from the inturned edge of the hem.

As to patent No. 1,926,761.

No separate discussion of patent No. 1,926,761, for stitched fabric article, in suit, is necessary at this time as the drawings of this patent are duplicates of Figs. 14–19 of the other patent in suit, No. 1,926,644.

■ The history of the development of this art shows that the patentee of the patents in suit accomplished what others for a long time had sought without success, and this is strong evidence of their patentability. Hookless Fastener Co. v. G. E. Prentice Mfg. Co. (C. C. A.) 68 F.(2d) 940, 941.

From the time of the Dearborn United States patent No. 679,553, issued July 30, 1901, it was known that the work support could be tilted by hand, in order to depress the top surface thereof, to introduce or remove the work, and at no other time; but no skip stitch was produced.

About thirty years elapsed between the issue of the Dearborn patent, No. 679,553, and the filing date of the application for United States patent No. 1,926,644 in suit.

The American Blind Stitch Machine Company, the real defendant in this case, was being continually requested to adapt its conventional machine for use on light and thin fabrics.

The class of work now produced by the patented machine in suit was, prior to the appearance of that machine on the market, done by hand and an enormous saving in labor cost has been produced by that machine.

The trade had been looking for a machine of this kind for many years.

Subsequent to the appearance of the patented machine in suit upon the market, the real defendant, American Blind Stitch Ma-

chine Company, put out a machine with a rib shaped like a ratchet, but that machine failed to accomplish the results achieved by the machine of the patent in suit and was taken off the market.

The only machine on the market suitable for producing a skip stitch, prior to the appearance on the market of the patented machine in suit, was a Lewis machine, which is in evidence as Exhibit 5.

This type of Lewis machine had been on the market from fifteen to eighteen years. It had a plunger which was moved up and down in a vertical direction in order to form the node or bight. Mechanism was provided whereby said plunger was either held stationary at predetermined intervals, or said plunger, on certain of its strokes, would be moved upwardly for a shorter distance than on intermediate strokes, thus producing the skip stitch effect. The Lewis machine was unsatisfactory except upon thick and heavy material, and could not be run at a greater speed than 1200 to 1300 revolutions per minute, while the patented machine in suit can run as high as 4,000 revolutions per minute.

Exhibit 7 shows the patented stitched article; the stitch being a chain stitch with the loops overlying the inturned edge of the hem, some of these loops passing at spaced intervals through the base of the fabric, so as to be visible upon the fair or face side of the base layer of the fabric article.

Exhibit 7A shows the stitch made by means of the Lewis machine, Exhibit 5; the stitch being a tight lock stitch, which did not have loops which overlapped the inturned edge of the fabric.

The plaintiffs presented the evidence of practical men, that the patented stitch produced a garment which had a much better fit and hang, it had the necessary flexibility to prevent the presser from forming little pleats, that the advantage of having the loops overlapping the inturned edge of the hem was to give the desired flexible stitch and to prevent unraveling when the garment was pressed, and that prior to the time the patented machine in suit appeared on the market, there was no other machine which could accomplish this class of work in a satisfactory manner.

The plaintiffs also produced the evidence of practical men, that the Lewis machine stitch was not satisfactory because too much thread was visible on the right side of the material, and that it could only be used on pleated skirts, due to the tightness of the stitch.

The defendants called no practical men as witnesses to contradict the testimony of the practical men called by the plaintiff, but relied on the patents of the prior art.

The following patents were cited by the Patent Office as file wrapper references: No. 1,133,808, to Lewis; No. 1,133,809, to Lewis; No. 1,278,204, to Pierce; No. 1,588,-132, to Mueller; No. 1,739,081, to Mueller; No. 1,903,933, to Mueller.

All of these, with the exception of No. 1,278,204 to Pierce, and No. 1,903,933 to Mueller, have been cited by the defendants.

The defendants also offered in evidence the following patents: Reissue No. 7,985, to Bosworth; 639,669, to Dearborn; 679,553, to Dearborn; 705,325, to Dearborn; 705,-326, to Dearborn; 814,025, to Dearborn; 830,699, to Arbetter; 872,676, to Onderdonk; 937,274, to Arbetter; 937,275, to Arbetter; 1,012,791, to Arbetter; 1,025,082, to Dearborn; 1,059,966, to Arbetter; 1,169,934, to Dearborn; 1,230,159, to Hayes; 1,255,628, to Moulton; 1,291,503, to Hayes; 1,333,310, to Hayes; 1,588,134, to Mueller; 1,588,135, to Mueller; 1,592,447, to Dearborn; 1,622,-414, to Brody.

The file wrapper references appear to me to be just as close as the additional art cited by the defendants.

The defendants' expert discussed all of the Dearborn patents and the patent No. 1,739,081 to Mueller, which related to improvements on machines of the Dearborn type, but upon cross-examination conceded that every one of these patents was just as remote from the patented machine as Exhibit 8, which exemplifies the commercial Dearborn machine prior to the time that the machine of the patent in suit appeared on the market.

Exhibit 8 has a work table which can be depressed by hand in order to insert or remove work, but has no mechanism of the type of the machine of the patent No. 1,926,644 in suit for doing this automatically so as to skip stitches.

Exhibit 9 shows the stitch produced by this old Dearborn machine, but this exhibit does not show stitches which overlap the inturned edge of the hem, and which periodically loop through the face side of the base layer.

All the other patents referred to by defendants' expert, which showed a machine that could produce a skip stitch, were of the type in which a vertically operable plunger was utilized, and in them the work support is

not automatically raised or lowered during the sewing operation. Such plunger machines depend wholly upon regulating the upward movement of the plunger.

Plaintiffs' Exhibit 5 was typical of all these plunger machines, and when the plunger was in its lowest position, it was out of contact with the fabric.

Neither the Dearborn nor the Lewis machines could do the work of the patented machine.

The prior art patents may be briefly analyzed as follows:

Reissue patent No. 7,985, to Bosworth, shows a lock stitch in which a bottom thread is utilized instead of the chain stitch of the patents in suit, and the stitches do not overlap the edges of the two pieces of braid.

Patent No. 639,669, to Dearborn, Fig. 3 and Fig. 1, show a feed cylinder O which was intermittently turned by means of a clutch device. The bight or node of the fabric was formed by the annular rib or shoulder of feed cylinder O, and there is no mechanism for moving the shaft of the cylinder O up and down.

Patent No. 679,553, to Dearborn, shows the annular feed frame 70 which was mounted upon the shaft 11, and could be manually depressed in order to permit the work to be inserted.

Without going into any lengthy description of this patent, it is sufficient to say that while it shows feed rolls so mounted that they could yield in proportion to the thickness of the work, it does not show any mechanism for rocking the feed frame 70 or for producing a skip stitch.

Patent No. 705,325, to Dearborn, shows the same angular and pivoted feed frame 70 which is disclosed in the last Dearborn patent, the disc 76 for supporting the cloth and the serrated feed wheel 77; the diameter of the disc 76 being slightly greater than the diameter of the feed wheel 77, so as to form a rib or node in the work. There is no mechanism shown for automatically rocking the main frame 70, or for producing a skip stitch. There is also a reference to an additional and yieldingly supported lower feed member, and this is described in the next Dearborn patent.

Patent No. 705,326, to Dearborn, in addition to the feed wheel 77 and the rib-forming disc 76 described in the last Dearborn patent, shows a composite feed wheel or roll 100–101. It needs no further comment, as it is substantially the same in operation as the last Dearborn patent.

United States patent No. 814,025, to Dearborn, shows an angular work supporting frame 40, mounted upon the shaft 34. The member 40 is designated in the specification as follows: "40 is a horizontal forwardly-extending spring sustained work supporting frame" (page 3, lines 71 and 72), and as a "work supporting plate" (page 3, line 105). Fig. 2 shows the work supporting horn 55 and a disc 60 for forming the rib or node in the work. The disc 60, which should freely turn upon its shaft, was located between two yielding and spring supported fingers 65 and 75. The member 40 is again designated as being a work supporting plate (page 4, line 59). The supplemental fingers 65 and 75 provided a local yield in order to make allowance for differences in the thickness of the fabric. The fingers 65 and 75 correspond in function to the fingers 80 and 81 of the machine patent in suit, in which at Fig. 11 they are shown as being connected to the work supporting plate 4. This reference is not pertinent; it merely shows a work supporting plate 40, which could be manually turned so as to permit the insertion or removal of the work.

Even if, when the feed dog is operated, it may depress the supplemental fingers, as stated by defendants' expert, that is immaterial because while the feed is operating to forwardly move the fabric, the needle is necessarily out of the fabric so that the stitch is not formed during the movement of the feed dog. The feed dog is essentially a part of the stitch-forming mechanism, because a sewing machine cannot form a stitch unless there is mechanism for feeding the fabric.

United States patent No. 814,026, to Dearborn, shows the same supporting plate as the last Dearborn patent, and relates to an improved feed. It is not pertinent.

Patent No. 830,699, to Arbetter, shows a machine having a bobbin so as to produce a lock stitch having two threads. It also shows a vertically moving bender or plunger G, which was moved only once for each two strokes of the needle. The plunger G is operated by the cam G8 through intermediate links, and by the cam H the movement could be rendered inoperative at alternate strokes of the needle. A work support E was provided, which could be manually depressed in order to insert the work. The work support E was not a device for forming the bight or node in the goods.

This reference is not pertinent, as it is of the general type of Exhibit 5. Reference was made in the last Arbetter patent to an earlier Arbetter patent, No. 630,385, but as

that patent was not offered in evidence, it requires no consideration.

Patent No. 872,676, to Onderdonk, shows merely some detail improvements for forming the bight or node in the fabric. Two feed dogs 53 are shown and the rib H which forms the node in the fabric. The rib H was adjusted in order to form a blind stitch at all times, which is not visible upon the face or fair side of the fabric. The depth of the blind stitch could be regulated by vertically adjusting the member H, but there is no mechanism shown which would indicate any relationship between the up and down adjustment of the member H and the strokes of the needle. Except for the regulation of its depth, the needle formed the same stitch at every stroke thereof. There was no skip stitch, and the member H was not the work support. This is likewise true of the dislike rib I, which was provided with projections e in order to vary the bight of the needle. The only purpose for moving or adjusting the rib was to vary the amount of crimp or node in the goods. The reference is not pertinent.

Patent No. 937,274, to Arbetter, shows the stitch or seam which was made with the use of the previously discussed Arbetter patent, No. 830,699, which was a lock stitch instead of a chain stitch. In making a lock stitch, the needle is passed through the fabric, and as the needle moves backward it throws out a loop of the needle thread, and the shuttle or bobbin thread is passed through the loop. In Fig. 1 the needle, having the thread N, first enters the top layers B, at the point a. This is to the right of the inturned edge B'. In Fig. 3 the needle is shown as passing through the two upper layers B, and through part of the thickness of the base layer A, so that the needle emerges at the point b, as shown in Fig. 1. The needle is then moved backwards so as to emerge from the top layer B, at the point a. During this last-mentioned operation, a loop of the needle thread is thrown out at point b. The bobbin thread L is passed through this loop in order to anchor said loop of the needle thread. The needle in this first stroke is moved in a direction which was diagonal to the edge B'. The needle in its second stroke enters the layers B, at the point c, and emerges from the layers B at the point d, and is moved in a direction parallel to the edge of the hem B'. As the needle loop is thrown out at the point d, said loop of needle thread is entered by the looper thread L, and this operation is continued so as to form the stitch. Nothing is said about exposing the thread at the fair or face side

of the base layer A. In practice the tension of the needle thread pulls the looper thread L under and to the right of the inturned edges B' of the hem. The looper thread L does not form loops overlapping the edge of the hem, it is merely arranged in a zigzag fashion, being anchored at the points d to the top layer B of the fabric, and also at the points b to the base layer of the fabric, the said points b being back of the edge B'. There is a distinction between a loop and a zigzag thread. If a hole be punched in a piece of fabric and a U-shaped piece of thread be inserted through said hole, so that both legs of the U are located in the same hole, you then have a loop. If two holes be punched in a piece of fabric, and a piece of thread be passed through one of said holes and back through the other of said holes, you have a bight or U-shaped piece of thread, but you do not have a loop within the meaning of the patents in suit, and in the common acceptance of this term in the sewing machine art.

Fig. 1 of patent in suit, No. 1,926,761, is identical with Fig. 14 of the patent in suit No. 1,926,644, and they show a series of interlaced loops. Each of said loops has its two legs located in a single hole. Said loops overlap the edge of the hem and are anchored at intervals to the base layer of the fabric by passing through said base layer so as to be visible on the face side.

The claims of the patent in suit, given their real scope and meaning, cannot be read upon the Arbetter patent, No. 937,274.

Patent No. 937,275, to Arbetter, refers to a lock stitch instead of the chain stitch of the patents in suit.

Assuming that the stitch which is shown in Fig. 1 is formed from the right-hand side of the paper toward the left-hand side of the paper, the needle first entered the base layer A at the point D, and the needle then emerged from the base layer at the point E, thus throwing out a loop of needle thread. In this stroke, the curved needle did not pass through the hem; the stitch was a blind stitch, which did not show on the under or fair side of the fabric. The bobbin or looper thread O was then passed through the loop of needle thread which had thus been formed. The needle was then moved backwards, so that it now emerged from the base layer A, at the previously mentioned point n. In this first stroke of the needle, it moved in a direction parallel to the edge of the hem. In its second stroke, the needle was moved in a direction diagonal to the edge of the hem; the needle emerging from the superposed layer B at the

point G. As the needle loop was thrown out at the point G, the looper thread was passed through said needle loop at the point G. The tension of the machine then pulled the loop H of the needle thread into the layer B, so that the loop of the bobbin thread O was also pulled into the upper layer B. The stitch was then continued in the manner previously described. The interlaced loops of the needle thread and of the bobbin thread, as shown on the right-hand side of Fig. 1, engaged each other back of the edge of the hem, and said loops of the needle thread and of the bobbin thread were interlaced within the thickness of the superposed layer B. The loop J, which is shown at the right-hand side of Fig. 1, is substantially the same as the loop of needle thread F, so that no further description thereof is required. A skip stitch is not shown in this reference.

Every one of the sections of the looper thread was connected at its end to the loops of needle thread F and J. The sections of the bobbin thread O were not interlaced with each other. In the patents in suit the interlaced loops which passed through the hem are at intervals elongated so as to pass through the base layer A. Arbetter made no such suggestion, but relied wholly upon forming the needle thread into pairs of parallel loops F and J.

Patent No. 1,012,791, to Arbetter, shows another lock stitch. The first stroke of the needle was in a direction diagonal to the edge of the upper layer b. The needle entered the base layer a, passed through part of the thickness of the base layer a, and then passed through the superposed layer or layers b, so that the needle emerged from the upper layer b, and threw out a loop of needle thread o, through which loop the bobbin thread d was passed. The tension of the needle thread pulled the bobbin thread partially into the upper layer b, and this completed the first stitch. The needle in its second stroke was moved in a direction parallel to the edge of the superposed layers b, but did not penetrate either the base layer a or the superposed layer b. At the conclusion of its second stroke, the needle threw out a loop of needle thread which was entered by the bobbin thread d. The needle was then moved back to its starting position. This caused the bobbin thread d to be pulled over the edge of the upper layers b. At the conclusion of the stitching, the needle thread c was located in a straight line, which was practically invisible at the edge of the upper layers b.

What this reference shows is a zigzag line of bobbin thread which was anchored to the upper layers b; the lower ends of the zigzag thread being engaged by additional loops of the needle thread. The bobbin thread was located in a zigzag course, and the loops of the bobbin thread did not overlap the edge of the material d.

Patent No. 1,025,082, to Dearborn, shows angular work support 40, mounted on shaft 34.

It is not any more pertinent than any of the other references.

Patent No. 1,059,966, to Arbetter, shows a machine of the same general type as the previously discussed patent No. 830,699, having a vertically movable bender or plunger G, and a work support E, which could be adjusted by hand, but there was no mechanism for automatically moving the work support E up and down.

Patent No. 1,133,808, to Lewis, a file wrapper reference shows a chain stitch. Fig. 1 shows chain loop 14, each of which has a portion 14a "buried in the goods lying at an oblique angle to the edge of the superimposed layer," and also a loop portion 14b which overlapped the edge of the hem, and was perpendicular to the hem.

This method of forming the chain loops made it necessary to form "lineal connections 15," which were substantially parallel to the edge of the hem. There was no skip stitch, and the loop ends which were connected by the lineal connections 15 were not visible at the face side of the base layer 10.

Lewis did not show interlaced loops overlapping the edge of the hem; some of said loops being continued so as to extend through the base layer as shown in the patent No. 1,926,761 in suit. If the loops 10a, which are shown in Fig. 2 of patent No. 1,926,761 in suit, were buried in the base layer, such loops would be tightly and frictionally held, and the stitch would not be yieldable and elastic, but by carrying the bottoms of loops 10a through the base layer 10, the desired elastic stitch is secured.

■ The interlaced loops shown in Fig. 1 of patent No. 1,926,761 in suit are much more elastic than the loop formation of the Lewis patent. As the patent in suit was issued over this reference, there is a strong presumption of patentability. Rubenstein v. Slobotkin (D. C.) 33 F.(2d) 603.

Patent No. 1,133,809, to Lewis, shows a chain stitch. Some of the stitches which

passed through the two upper layers, also passed through the base layers. All of the loops of the chain stitches were back of the edge of the hem, and none of the loops passed completely through the base layer 10, and were exposed upon the fair or face side of said base layer 10. This was also a file wrapper reference, and the patent issued over it.

Patent No. 1,169,934, to Dearborn, other than showing the familiar angular work support 10, this reference is not pertinent.

Patent No. 1,230,159, to Hayes, assigned to Arbetter Felling Machine Company, in Fig. 8 shows the vertically movable bender or plunger 54. The upward limit of the upward stroke of the bender 54 could be controlled by means of a stop pin 58.

Patent No. 1,255,628, to Moulton, and assigned to Arbetter Felling Machine Company, in Fig. 2 shows the vertically movable plunger or bender. This bender or plunger was actuated by complicated intermediate mechanism, and this mechanism included a series of toggle arms.

The work support 30 could be depressed by the knee of the operator in order to introduce the work. This machine produced a lock stitch.

Patent No. 1,291,503, to Hayes, assigned to Arbetter Felling Machine Company, shows in Fig. 5 the plunger or bender 37. It was a lock stitch machine, and the type of work done by this machine is shown in Fig. 8. It requires no further discussion.

Patent No. 1,333,310, to Hayes, assigned to Arbetter Felling Machine Company, shows the bender or plunger 22, actuated by a great many complicated parts. The more parts or connections there may be, the less satisfactory, and the more uncertain the operation of the machine, if a plunger is utilized. This was one of the reasons why the plunger machines were unsatisfactory in actual practice, and further because they could not be operated at high speed, and the throw of the plunger could not be accurately controlled.

Patent No. 1,588,132, to Mueller, assigned to Lewis Invisible Stitch Machine Company, shows a plunger 28, made in two parts, which was vertically reciprocated. This was a lock stitch machine and a skip stitch plunger machine. It represents another attempt of the Lewis Invisible Stitch Machine Company to make practical. the plunger type of blind stitch sewing machine by forming the plunger of two parts, one of which was movable relative to the other, but this only added to the complication of the device, and this type of plunger was not installed in Exhibit 5. This was also a file wrapper reference, and the patent issued over it.

Patent No. 1,588,134, to Mueller, assigned to Lewis Invisible Stitch Machine Company, shows another lock stitch type machine. The bender 51 was of the plunger type. It also shows a hook or bobbin 96a, and a bobbin thread 99. This was a lock stitch machine of the type exemplified by Exhibit 5.

Patent No. 1,588,135, issued to Mueller, assigned to Lewis Invisible Stitch Machine Company, shows the plunger 50, which was in the form of a lever, having an end 54.

Patent No. 1,592,247, to Dearborn, shows a work support 7, which was pivoted in the usual manner and had supplemental fingers or levers 12. This reference shows nothing which relates to the skip stitch operation.

Patent No. 1,622,414, to Brody. This was a lock stitch machine, and shows the needle thread 105, and the bobbin thread 106. It utilized an upper plunger 68, and a lower plunger 95, and the usual hook 100, which is located in the shuttle housing.

Patent No. 1,739,081, to Mueller, assigned to Lewis Invisible Stitch Machine Company, shows the usual rib 38, having the feeding teeth 43. The rib not only formed the node or bight in the goods, but it also acted to feed the goods. The rib 38 was mounted upon a shaft which would be moved up and down to prevent the teeth 43 from dragging the cloth backwards when the rib 38 was turned in the reverse direction. When the rib was turned in the forward direction, the shaft of the rib was in the upper position, so that the rib could feed the goods forwardly. When the rib was turned in the reverse direction, its shaft was lowered so that the rib would not engage the fabric during the backward movement of the rib. Not only is nothing said about any skip stitch function, but this mechanism could not perform such function.

This was a file wrapper reference and the patent issued over it.

An examination of the prior art convinces me that no prior patents showed the structure of claim 5 or of claim 6 of patent No. 1,926,644 in suit, with the understanding that the work support is of the type of the member 4 of the said patent in suit, and there is no prior patent which showed the idea of automatically rocking a work support and rib-forming member in combination to produce a skip stitch.

■ Of necessity, reference in said claims 5 and 6 to a work support is to that type of work support which is disclosed in the patent. Primarily the meaning of a term in a patent is to be determined by the language of the patent itself. Rajah Auto Supply Co. v. Belvidere Screw & Mach. Co. (C. C. A.) 275 F. 761.

It is likewise true of the claims of the stitched-fabric article patent, No. 1,926,761, that no prior patent showed the stitch of that patent, with its interlaced loops which overlap the inturned edge of the hem; the stitches passing through the base layer being continuations of the loops which pass through the two layers of the hem.

■ Even if some of the claims of the patents in suit might read verbally upon the device of a prior patent, if the principle of operation of the device is not the principle of operation of the patent, there is no anticipation. Westinghouse v. Boyden Power-Brake Co., 170 U. S. 537, 18 S. Ct. 707, 42 L. Ed. 1136.

Unless the prior art devices show substantially the same subject-matter or idea as the claim of the patent in suit, the claim cannot be invalidated. Hookless Fastener Co. v. G. E. Prentice Mfg. Co. (C. C. A.) 68 F.(2d) 848, 850, 851; Mantle Lamp Co. of America v. George H. Bowman Co. (C. C. A.) 53 F. (2d) 441.

■ That an operator, with the knowledge he might have gained by seeing patent No. 1,926,761 in suit, could make this stitch by hand or by adjusting and manually rocking the work table of the prior Dearborn machines, does not invalidate the claims. Krementz v. Cottle Co. (C. C.) 39 F. 323, reversed 148 U. S. 556, 13 S. Ct. 719, 37 L. Ed. 558; Franc-Strohmenger & Cowan v. Arthur Siegman, Inc. (C. C. A.) 27 F.(2d) 785.

■ Patents are required to be so phrased as to disclose the invention claimed to those skilled in the art.

■ The objection that the patent, No. 1,926,644, for the machine did not contain a full disclosure does not require extended discussion, for the reason that the defendants' expert admitted that any skilled mechanic, who was acquainted with the Dearborn machine, could supply the details which are not specifically mentioned in the patent, No. 1,926,644.

■ The objection that new matter was inserted cannot be sustained. Patent No. 1,926,761 was a continuance of the original machine application, and that application, both by description and drawings, showed a fully operative machine for making the article. Any part of the original application could be transferred by the patentee to the application for No. 1,926,761.

The article of No. 1,926,761 can be made by merely operating the skip stitch machine of No. 1,926,644, so that the loops will overlap the edge of the hem.

The objections as to the forms of the claims seem to me to be without merit. Jones v. General Fireproofing Co. (C. C. A.) 254 F. 97; Morley Sewing Mach. Co. v. Lancaster, 129 U. S. 263, 9 S. Ct. 299, 32 L. Ed. 715; Hildreth v. Mastoras, 257 U. S. 27, 42 S. Ct. 20, 66 L. Ed. 112; American Chain Co. v. Bethlehem Bumper Corp. (D. C.) 25 F.(2d) 759; Bragg-Kliesrath Corporation v. Walter S. Vogel & Co., Inc. (C. C. A.) 67 F.(2d) 531.

See Patent Office Practice, Ex parte Van Zandt, 21 U. S. Pat. Quarterly, 26; Ex parte Johnson, 17 U. S. Pat. Quarterly, 374.

Certainly No. 1,926,644 does not claim a device of the "plunger type," and No. 1,926,-761 does not mention a blind stitch; the only thing shown are the loops, and but a single embodiment is described.

■ The patents in suit are valid.

Claims 5 and 6 of patent in suit, No. 1,926,644, read as follows:

"5. A blind-stitch sewing machine comprising stitch-forming mechanism, a pivoted device adapted to support the material which is being stitched, means for forming a bight in said material while it is located on said pivoted device, a shaft, actuating means actuated by said shaft and automatically tilting said pivoted device at predetermined intervals."

"6. A blind-stitch sewing machine comprising stitch-forming mechanism, a pivoted device adapted to support the material which is being stitched, a shaft, a first gear connected to said shaft and turnable therewith, a second gear intermeshing with said first gear, an eccentric device connected to said second gear, operating means connected to said eccentric device and turning said pivoted device at predetermined intervals, and means for forming a bight in the material which is being stitched while it is located on said pivoted device."

The alleged infringing machine of the American Blind Stitch Machine Company, shown in the drawing Exhibit 12, has a reduction gear drive from the main shaft, and

this reduction gear drive periodically turns the work table in order to produce the identical skip stitch result of the patented machine.

Claim 5 is infringed.

As to claim 6, defendants can escape infringement only if, by substituting a cam for the eccentric device referred to in claim 6, they have done more than merely substitute one conventional intermediate drive for another conventional intermediate drive.

I believe they have not.

■■■ A cam functions because it has an eccentric periphery, and the substitution of a cam for an eccentric is merely a reversal of parts. Infringement cannot be avoided by appropriating the essence of the invention and merely substituting one conventional intermediate drive for another conventional intermediate drive. Cazier v. Mackie-Lovejoy Mfg. Co. (C. C. A.) 138 F. 654.

The claims of the patent in suit, No. 1,926,761, for the Stitched Fabric Article read as follows:

"1. A stitched fabric article comprising a base fabric layer and a superposed fabric layer having an inturned edge portion, the layers of said edge portion being connected to each other by stitches which miss the base layer, said stitches having loops which overlap the inner edge of said edge portion, said layers of said edge portion being connected to the base portion by stitches which pass through said base layer and are visible at the exposed face of said face layer, the last mentioned stitches passing through said base layer at points which are outwardly and laterally spaced from the inner edge of said edge portion.

"2. A stitched fabric article comprising a base fabric layer and a superposed fabric layer having an inturned edge portion, the layers of said edge portion being connected to each other by stitches which miss the base layer, said stitches having loops which overlap the inner edge of said edge portion, said layers of said edge portion being connected to the base portion by stitches which pass through said base layer and are visible at the exposed face of said base layer, the last mentioned stitches passing through said base layer at points which are outwardly and laterally spaced from the inner edge of said edge portion, all said stitches being located along substantially the same straight line.

"3. A stitched fabric article comprising a plurality of layers of fabric, said layers being connected to each other by stitches which are invisible at the face of one of said layers, and by stitches which are visible at said face and which pass through the layer which has said face, the first mentioned stitches having loops which overlap the adjacent edge of one of said layers.

"4. A stitched fabric article comprising a plurality of layers of fabric, said layers being connected to each other by stitches which are invisible at the face of one of said layers, and by stitches which are visible at said face and which pass through the layer which has said face, the first mentioned stitches having loops which overlap the edge of one of said layers, the second mentioned stitches being outwardly and laterally spaced from the edge of one of said layers."

An examination of the Exhibits 11 and 12 convinces me that there is no difference between the patented article and the article of which complaint is made, and that both patents in suit are infringed.

The defendants, as so frequently happens, extol the prior art, but, with all of it to choose from, show how highly they consider the invention of the patents in suit by appropriating such inventions.

I therefore conclude:

The plaintiffs have established the validity of the patents in suit, and the infringement by the defendants of the claims of each of the said patents in suit, on which the above-entitled suits are based.

The plaintiffs are entitled to a decree in each case against the defendants for an injunction, for their profits and damages, with costs, and for the usual order of reference.

Decrees may be entered in accordance with this opinion. Settle decree on notice.

Submit proposed findings of fact and conclusions of law in accordance with this opinion, for the assistance of the court, as provided by the rules in equity and the equity rules of this court.